Joro Walker, USB# 6676
150 South 600 East, Ste. 2A
Salt Lake City, Utah  84102
801.487.9911
jwalker@westernresources.org

Attorney for Utah Physicians for a Healthy Environment
and Utah Moms for Clean Air

Samantha Ruscavage-Barz
NM Bar. No. 23276 (pro hac vice application pending)
WildEarth Guardians
516 Alto Street
Santa Fe, NM 87501
Tel. 505-988-9126 x1158/Fax 505-213-1895
sruscavagebarz@wildearthguardians.org

Attorney for WildEarth Guardians


### IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UTAH PHYSICIANS FOR A HEALTHY ENVIRONMENT, WILDEARTH GUARDIANS, and UTAH MOMS FOR CLEAN AIR, ) ) ) ) ) | Civil Case No. 2:11-cv-01181-SA Honorable Magistrate Judge Samuel Alba |
| Plaintiffs, ) ) | |
| v. ) ) | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| KENNECOTT UTAH COPPER, LLC ) ) | |
| Defendant. ) ) | |

### COMPLAINT

1.    This is a citizen suit brought pursuant to the Clean Air Act, 42 U.S.C. §§ 7401, et

seq.  At its Bingham Canyon copper mine in the Oquirrh Mountains of western Salt Lake

County, defendant Kennecott Utah Copper ("Kennecott") is emitting particulate matter ("PM") at levels in excess of those allowed by the Clean Air Act. Plaintiffs, citizens groups representing doctors, other health professionals, moms, families, conservationists, and outdoor enthusiasts (hereafter "Citizen Groups"), seek relief from this illegal air pollution and an order enjoining Kennecott from continuing to pollute the air in excess of the applicable limits.

2.     PM emissions are a major health threat to citizens living along the Wasatch Front. Salt Lake County is currently in violation of the health-based National Ambient Air Quality Standards ("NAAQS") limiting PM concentrations. According to the American Lung Association, Salt Lake City consistently ranks among the top ten (10) cities with the worst PM pollution. On days with severe PM pollution in Salt Lake, doctors have found that the effect on people who are consistently outdoors is similar to smoking a pack of cigarettes a day.

3.     PM pollution is not limited to dust. It can include soot from smokestacks, tailpipes, smoke, droplets of acidic gases, and heavy metals. Regardless of the nature of the particulates, however, all PM shares a common characteristic—these particles harm human health. PM consisting of microscopic particles less than 10 microns in diameter, or $1/7^{th}$ the width of a human hair, is a major threat to public health. Often referred to as $PM_{10}$, these particles are small enough to be breathed into the lungs and even absorbed into the bloodstream, causing respiratory system damage, adverse pulmonary effects, and potentially even premature death.

4.     To combat dangerous levels of $PM_{10}$ pollution, the Federal Government required the State of Utah to develop a cleanup plan for Salt Lake County, called a State Implementation Plan ("SIP"), as required by the Clean Air Act. In 1994, this plan was approved by the U.S. Environmental Protection Agency ("EPA") and incorporated into federal regulation. EPA

approved this plan because the agency concluded that the measures, when implemented and enforced, would ensure compliance with NAAQS for $PM_{10}$ in Salt Lake County.

5.      Among its other provisions necessary to ensure compliance with the health-based standard, the 1994 SIP limited $PM_{10}$ emissions associated with mining at the Bingham Canyon, one of the largest open pit copper mines in the world.  Specifically, the SIP limited the total material, including ore and waste, that could be moved at the mine site to no more than 150,500,000 tons per 12-month period.  The reason for this production cap was to ensure mining activities—including material hauling, dumping, digging, blasting, and machinery use—did not result in $PM_{10}$ emissions that would cause or contribute to violations of the NAAQS.

6.      For at least the last five years, however, Kennecott has regularly violated the SIP limit.  The amount of material moved at the Bingham Canyon mine has reached as high as 192,684,252 tons of ore and waste rock over a 12-month period.  To this day, Kennecott continues to violate the SIP limit for $PM_{10}$.  This violation would continue if , as the company plans, Kennecott moves as many as 260,000,000 tons of ore and waste rock per year in 2012 and beyond.

7.      During this same time, Salt Lake County's air quality has deteriorated.  According to EPA, Salt Lake County continues to violate the NAAQS for $PM_{10}$.  The Bingham Canyon copper mine has been identified by EPA as one of the main sources of human-caused air pollution in Salt Lake County that contributes to exceedances of the NAAQS.

8.      Although Kennecott claims that the violations alleged in this Complaint have been condoned by the State of Utah, Kennecott's actions are not allowed under federal law. Kennecott is bound by the federally enforceable production limit in the SIP, which was established in 1994 for the express purpose of improving air quality in Salt Lake County.

9.      Despite pleas from Citizen Groups, Kennecott has refused to comply with the

Utah SIP.  Citizen Groups now exercise their right under the Clean Air Act to bring this citizen

suit and respectfully request this Court to provide appropriate relief and redress.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal

question jurisdiction).  Citizen Groups' suit is filed under the citizen suit provision of the Clean

Air Act.  Kennecott has violated and continues to violate an emission standard or limitation.  See

42 U.S.C. § 7604(a)(1) (citizen suit provision of the Clean Air Act providing jurisdiction to

district courts to enforce emission standards or limitations).  The requested relief is authorized by

statute.  See 28 U.S.C. § 2201 (declaratory judgment); 28 U.S.C. § 2202 (injunctive relief); 42

U.S.C. § 7604(a) (power to enforce and apply civil penalties); and 42 U.S.C. § 7604(d) (costs

and attorney fees).

11.     The source causing the Clean Air Act violations is located in the District of Utah,

Central Division.  Thus, venue is proper in this judicial district.  See 42 U.S.C. § 7604(c)(1).

12.     Citizen Groups properly gave Kennecott more than 60-days written notice of the

Clean Air Act violations alleged in this Complaint and of their intent to bring suit to remedy the

violations.  See 42 U.S.C. § 7604(b)(1)(A) and 40 C.F.R. §§ 54.2 and 54.3(b) (2010) (providing

that no action may be commenced prior to providing notice).

13.     Specifically, on August 8, 2011, Citizen Groups provided Kennecott with written

notice, via U.S. Postal Service certified mail, return receipt requested, of the Clean Air Act

violations alleged in this Complaint and of their intent to file suit if the violations were not

resolved.  In accordance with the Clean Air Act, Citizen Groups also provided copies of this

written notice, via U.S. Postal Service certified mail, return receipt requested, to the

Administrator of EPA and to the State of Utah. According to green return receipt cards received by Citizen Groups, Kennecott accepted this notice on August 11, 2011. More than 60 days have passed since Kennecott received Citizen Groups' notice letter.

14.    Kennecott has not remedied the Clean Air Act violations alleged in the notice letter and this Complaint.

## PARTIES

15.    Plaintiff UTAH PHYSICIANS FOR A HEALTHY ENVIRONMENT ("Utah Physicians") is a nonprofit corporation incorporated in the State of Utah. The organization consists of health professionals concerned about the health risks of air pollution. The organization is dedicated to protecting the health and well-being of the citizens of Utah by promoting science-based education and interventions that result in progressive, measurable improvements to the environment. Founded in 2007, the Utah Physicians has sought to address the Wasatch Front's serious air pollution problems by raising awareness of the adverse health impacts of poor air quality and the availability of reasonable solutions.

16.    Members of Utah Physicians are harmed by Kennecott's ongoing violations of the Clean Air Act. Members of Utah Physicians have observed and been adversely affected by $PM_{10}$ emissions emanating from Kennecott's Bingham Canyon mining operations on numerous occasions in the last five years. These emissions are offensive to observe, particularly given Utah Physicians' knowledge of the adverse health effects of such pollution and pose a significant threat to the health, well-being and quality of life of group members and their patients, friends, families, and neighbors. Utah Physicians feel ethically obligated to confront this illegal pollution in order to protect the health and welfare of its members, patients, friends, families, and communities. Members of Utah Physicians live in or near Salt Lake County and plan to continue

to live in or near Salt Lake County for the foreseeable future. They will continue to observe and be adversely affected by harmful emissions if the violations at issue in this Complaint are not remedied. Furthermore, members of Utah Physicians will face increasing challenges in maintaining the health and welfare of their patients, friends, families, and communities. A favorable ruling will improve overall air quality in Salt Lake County, reduce the sight of offensive emissions, and will aid in protecting the health of Utah Physicians' members, patients, friends, families, and communities.

17.     Plaintiff WILDEARTH GUARDIANS ("Guardians") is a nonprofit conservation organization dedicated to protecting and restoring wildlife, wild rivers, and wild places in the American West, and to safeguarding the Earth's climate and air quality.

18.     Guardians and its members work to reduce harmful air pollution in order to safeguard public health, welfare, and the environment. Guardians has approximately 4,500 members, several of whom live in or near Salt Lake County, Utah. Guardians' members frequently engage in outdoor recreation, including running, hiking, cycling, and wildlife viewing, in or near Salt Lake County and enjoy doing so when the air is clean and clear. Guardians' members have observed and been adversely affected by air pollution from Kennecott's Bingham Canyon mining operations, in particular by dust clouds and other $PM_{10}$ emissions, while recreating. Observing and being exposed to this air pollution has diminished their enjoyment of outdoor recreational activities because this air pollution is offensive to view, increases their anxiety over health impacts and adversely affects their health. Indeed, Guardian members have been forced to curtail their outdoor activities when $PM_{10}$ air pollution levels are high. Guardians' members intend to continue recreating outdoors throughout the foreseeable future. A

favorable ruling in this case would allow Guardians' members to continue and more fully enjoy their outdoor recreation activities without jeopardizing their health.

19.    Plaintiff UTAH MOMS FOR CLEAN AIR ("the Moms") is a group of mothers dedicated to cleaning up Utah's dirty air and safeguarding clean air for the health of their children.

20.    Members of the Moms have children who are suffering from asthma and other respiratory ailments that are made worse when air pollution in Salt Lake County exceeds health standards, often called "Red Alert" days.  Members of the Moms have seen and been offended and affected by air pollution coming from Kennecott's mining operations.  Members of the Moms have observed that on unhealthy air days, $PM_{10}$ emissions emanating from Kennecott's mining operations contribute to the air pollution concentrations.  A favorable ruling in this case will help to address the region's air pollution problems, enhancing the health of the Moms' children.  A favorable ruling will also eliminate illegal air pollution that has been observed by and affect the Moms and their families, improving their ability to enjoy life and helping to protect their health.  Members of the Moms live in and around Salt Lake County and plan to continue to do so for the foreseeable future.  Without a favorable ruling, the Moms and their families will continue to be harmed by Kennecott's illegal air pollution.  A ruling will redress the Moms' present and future injuries.

21.    Citizen Groups are "person[s]" within the meaning of 42 U.S.C. § 7602(e). Therefore, under the Clean Air Act, they may commence this civil enforcement action.

22.    Defendant KENNECOTT UTAH COPPER, LLC ("Kennecott"), a wholly owned indirect subsidiary of the Rio Tinto Group, an international corporation, is a mining, smelting, and refining company.  Kennecott is headquartered in South Jordan, Utah.  Kennecott owns and

operates the Bingham Canyon copper mine and associated copper processing operations in western Salt Lake County.  Kennecott is responsible for the violations alleged in this complaint.

23.    Kennecott is a "person" within the meaning of 42 U.S.C. § 7602(e).  Therefore, under the Clean Air Act, Kennecott may be subject to a citizen enforcement action.

## LEGAL BACKGROUND

### I.    Clean Air Act

24.    Congress enacted the Clean Air Act to "speed up, expand, and intensify the war against air pollution in the United States with a view to assuring that the air we breathe throughout the Nation is wholesome once again."  H.R.Rep. No. 1146, 91st Cong., 2d Sess. 1,1, 1970 U.S. Code Cong. & Admin. News 5356, 5356.  The Clean Air Act's explicit goal is to, among other things, "protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of the population."  42 U.S.C. § 7401(b)(2).

25.    Towards this end, the Clean Air Act employs a model of cooperative federalism. It starts when the U.S. Environmental Protection Agency ("EPA") sets health and welfare-based National Ambient Air Quality Standards ("NAAQS") for an air pollutant in accordance with Section 109 of the Clean Air Act.  See 42 U.S.C. §§ 7409(a).  EPA is required to establish NAAQS to ensure that pollution concentrations in the air that the public breathes are limited to the levels requisite to protect health and welfare with an adequate margin of safety.  See 42 U.S.C. § 7409(b).

26.    Once EPA has established a NAAQS, individual States must develop State Implementation Plans ("SIPs") to "provid[e] for implementation, maintenance, and enforcement" of the standards.  42 U.S.C. § 7410(a)(1).  A SIP consists of "emission limitations and other

control measures, means, or techniques...as well as schedules and timetables for compliance, as may be necessary or appropriate to meet the [Clean Air Act]."  42 U.S.C. § 7410(a)(2)(A). Above all, a SIP must be "enforceable."  Id.  States submit these plans to EPA for approval in accordance with Section 110 of the Clean Air Act.  See 42 U.S.C. § 7410(a).  EPA reviews these submissions to ensure that the SIP meets the minimum requirements of the Clean Air Act.  If the proposal meets these requirements, EPA approves the plan or plan revision as part of the SIP. See 42 U.S.C. § 7410(k)(3) (providing that EPA shall approve, disapprove, or partially approve or disapprove a SIP).

27.     Once approved, a SIP may only be challenged through the filing of a Petition for Review with the appropriate "United States Court of Appeals" within 60 days of the EPA approval.  42 U.S.C. § 7607(b)(1) (setting forth jurisdiction and timing restriction for review of substantive EPA actions).

28.     When fully approved, a SIP is incorporated into the code of federal regulations and becomes enforceable under the Clean Air Act.  See e.g., 40 C.F.R. § 52.2320 et seq. (incorporating provisions of Utah SIP).  Such federally enforceable provisions may only be revised through the federal rulemaking process set forth by the Clean Air Act and the Administrative Procedure Act.  See 42 U.S.C. §§ 7607(d)(1)-(6) (setting forth rulemaking requirements for "such...actions as the Administrator may determine"); 42 U.S.C. § 7607(h) (setting forth minimum 30 day public comment period for rules promulgated under the Clean Air Act); and 5 U.S.C. § 553(e) (setting forth general federal rulemaking procedures).

29.     To this end, the Clean Air Act is explicit that, except through a SIP revision and other limited circumstances not relevant to this case, "no...action modifying any requirement of an applicable implementation plan may be taken with respect to any stationary source by the

State or the [EPA] Administrator." 42 U.S.C. § 7410(i). In other words, a SIP cannot be unilaterally modified by a State or EPA without undertaking appropriate federal rulemaking procedures. Generally, a stationary source is a building, structure, facility or installation which emits or may emit any pollutant regulated under the Clean Air Act. The Kennecott Bingham Canyon mine is a stationary source.

30. As EPA has explained:

EPA's approval of a SIP has several consequences. For example, after EPA approves a SIP, EPA and citizens may enforce the SIP's requirements in Federal court under section 113 and section 304 of the Act; in other words, EPA's approval of a SIP makes the SIP "Federally enforceable." Also, once EPA has approved a SIP, a state cannot unilaterally change the Federally enforceable version of the SIP. Instead, the state must first submit a SIP revision to the EPA and gain EPA's approval of that revision.

74 Fed. Reg. 62717, 62718 (Dec. 1, 2009).

## II.    The Utah State Implementation Plan

31. The Utah SIP contains a number of provisions that have been adopted and approved as ensuring attainment and maintenance of the NAAQS. These provisions have been adopted as State laws and rules, which were then approved by EPA as part of the Utah SIP and incorporated into the code of federal regulations. 40 C.F.R. § 52.2320 et seq. As set forth by the Clean Air Act and Administrative Procedure Act, State rules or laws not explicitly approved by the EPA through a rulemaking process are not a part of the Utah SIP.

32. In 1994, EPA approved SIP provisions submitted by the State of Utah to control $PM_{10}$ emissions to attain and maintain compliance with the 24-hour $PM_{10}$ NAAQS in Salt Lake County. See 40 C.F.R. § 52.2320(c)(25); see also, 59 Fed. Reg. 35306 (July 8, 1994).

33. Among other provisions, this SIP approval incorporated by reference a set of State regulations entitled, "Utah State Implementation Plan, Section IX, Part A – Fine Particulate Matter ($PM_{10}$), Appendix A." 40 C.F.R. § 52.2320(c)(25)(i)(C).

34.     Section IX, Part A, Appendix A of the Utah SIP contains emission limitations and other standards for a number of $PM_{10}$ sources including Kennecott's Bingham Canyon copper mine.  With regards to the "Kennecott Utah Copper – Bingham Canyon Mine," the SIP specifically states:

> Total material moved (ore and waste) shall not exceed 150,500,000 tons per 12-month period without prior approval in accordance with Section 3.1, UACR.  Compliance with the throughput limitation shall be determined on a rolling-annual total reported on a monthly basis.  On the first day of each new month, a new 12-month total shall be calculated using the previous 12 months.

Utah SIP, Section IX.A – Fine Particulate Matter ($PM_{10}$), Appendix A – Emission Limitations and Operating Practices, Section 2.2.W(2).[1]

35.     UACR 3.1, or section 3.1 of the Utah Air Conservation Regulations, addresses issuance of approval orders, or air permits, by the State of Utah.  The rule refers to R307-1-3.1. Among other things, the UACR states:

> Issuing of an approval order does not relieve any owner or operator of the responsibility to comply with the provisions of these regulations or the State Implementation Plan or other local, state and/or Federal requirements.

R307-1-3.1.4.  Since 1994, the UACR have been renamed and renumbered by the State of Utah, although the provisions of UACR 3.1 remain incorporated into the Utah SIP.  See 70 Fed. Reg. 59688 (Oct. 13, 2005) (stating "current rule sections R307-1-3.1.1, R307-1.3.1.2, R307-1.3.1.3, R307-1.3.1.4, R307-1.3.1.5, R307-1.3.1.6, R307-1.3.1.8, R307-1.3.1.9, and R307-1.3.1.10...will remain in the existing SIP.").

---

[1] The EPA maintains the Utah SIP online at https://yosemite.epa.gov/R8/R8Sips.nsf/Utah?OpenView (last accessed December 19, 2011).. Section 9, Part A, Appendix A may be downloaded at https://yosemite.epa.gov/R8/R8Sips.nsf/b2af5baa99cc429287256b5f0054df73/7868fa249dc40d8987256bad00746ebc/$FILE/IX.%20A.%20%20Appendix%20A..pdf (last accessed December 19, 2011).

### III.    Clean Air Act—Citizen Suit Enforcement

36.    Under 42 U.S.C. § 7604(a)(1)(A), any person may file suit in federal district court against any person who is "alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of an emission standard or limitation under this chapter."

37.    A "person" includes "an individual, corporation, partnership, association, State, municipality, political subdivision of a state, and any agency, department, or instrumentality of the United States any officer, agent, or employee thereof."  42 U.S.C. § 7602(e).

38.    An "emission standard or limitation" is defined to include any "standard, limitation, or schedule established...under any applicable State implementation plan approved by the Administrator...which is in effect...under an applicable implementation plan."  42 U.S.C. § 7604(f)(4).

39.    A citizen suit may only be commenced if 60 days notice has been provided to the Administrator of the EPA, the State in which the violation occurred or is occurring, and the violator, and where the Administrator of the EPA and the State have not "commenced and [are not] diligently prosecuting a civil action in a court of the United States or a State to require compliance[.]"  See 42 U.S.C. § 7604(b)(1).

40.    The Clean Air Act provides that "[t]he district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such emission standard or limitation...and to apply any appropriate civil penalties[.]"  42 U.S.C. § 7604(a).  The district court may also award costs of litigation to any party whenever such award is appropriate.  See 42 U.S.C. § 7604(d).

41.    The District Court is authorized to assess civil penalties of up to $37,500 per day for each violation.  See 42 U.S.C. § 7413(b), amended in part by the Debt Collection

Improvement Act of 1996; 42 U.S.C. § 7413(e); 28 U.S.C. § 2461(a); 40 C.F.R. § 19.4; 74 Fed.

Reg. 626 (Jan. 7, 2009).

## FACTUAL BACKGROUND

### I.    Particulate Matter Air Pollution

42.    PM is one of six pollutants for which EPA has established NAAQS under the

Clean Air Act in order to safeguard public health and welfare.  See 40 C.F.R. § 50.1, et seq.

(setting forth NAAQS).  EPA has designated NAAQS for two kinds of PM, $PM_{10}$ and $PM_{2.5}$,

based on particle size.  $PM_{10}$ includes all PM that is less than 10 microns in diameter, but greater

than 2.5 microns in diameter.  $PM_{2.5}$ includes all PM that is 2.5 microns in diameter or less.  See

40 C.F.R. §§ 50.6, 50.7, 50.13 (setting forth NAAQS for $PM_{10}$ and $PM_{2.5}$); see also, U.S. EPA,

"September 2006 Revisions to the National Ambient Air Quality Standards for Particulate

Pollution, Overview" at Slide 3.[2]  In setting NAAQS for both $PM_{10}$ and $PM_{2.5}$, EPA has

acknowledged that particles within the both size ranges constitute a serious threat to human

health at or above the concentrations established by the standards.

43.    $PM_{10}$ poses serious health risks.

44.    When breathed, $PM_{10}$ can penetrate deep into the lungs, where the particles may

accumulate, react, be cleared, or absorbed.  See 2006 EPA Presentation at Slide 6.  The effects of

short-term exposure can include "hospital admissions for cardiopulmonary diseases, increased

respiratory symptoms and possibly premature mortality."  71 Fed. Reg. 6144, 61145 (Oct. 17,

2006).  According to the EPA, the health impacts of breathing $PM_{10}$ include aggravated asthma,

increases in respiratory symptoms like coughing and difficult or painful breathing, chronic

---

[2] Available at http://www.epa.gov/pm/pdfs/20061013_presentation.pdf (last accessed Dec. 13, 2011) (hereafter referred to as "2006 EPA Presentation")

bronchitis, decreased lung function, and premature death in people with heart and lung disease.
See 2006 EPA Presentation at Slide 6.

45.     $PM_{10}$ is not limited to dust, but also includes gaseous chemicals, soot from

smokestacks and tailpipes, smoke, and heavy metals.  See 2006 EPA Presentation at Slide 4.

$PM_{10}$ that is directly emitted is generally referred to as "primary" $PM_{10}$, whereas $PM_{10}$ that forms

after air pollution is emitted is referred to as "secondary" $PM_{10}$.  As the Utah SIP explains:

> There are primary and secondary sources of $PM_{10}$.  Primary sources are those which emit $PM_{10}$ directly into the atmosphere from chemical, mechanical, or combustion processes. Secondary $PM_{10}$ particles form from the reactions of $SO_2$ [sulfur dioxide] and $NO_x$ [nitrogen oxide] emitted to the atmosphere to form sulfates and nitrates.

Utah SIP, Control Strategies, Fine Particulate Matter (PM10), Section IX.A.1.

46.     EPA first established NAAQS for $PM_{10}$ in 1987, limiting 24-hour concentrations

of the pollutant to no more than 150 micrograms/cubic meter and annual concentrations to no

more than 50 micrograms/cubic meter.  See 40 C.F.R. § 50.6; see also, 52 Fed. Reg. 24663 (July

1, 1987).  The annual $PM_{10}$ standard was revoked in 2006, but the 24-hour $PM_{10}$ NAAQS

remains in effect.  See 71 Fed. Reg. 61224 (Oct 17, 2006).

47.     A violation of the 24-hour $PM_{10}$ NAAQS occurs whenever the expected number

of exceedances in any one-year period exceeds 1.0.  See 40 C.F.R. § 50.6(a).  The expected

number of exceedances in any one-year period is determined by recording the number of

exceedances in each calendar year and then averaging them over the past three calendar years.

See 40 C.F.R. § 50, Appendix K, 2.1(a).

48.     An area violating the $PM_{10}$ NAAQS is designated by EPA as "nonattainment."

See 42 U.S.C. §§ 7407(d)(1)(A)(i) and (d)(1)(B) (defining nonattainment area and setting forth

requirements for designations).  States are obligated to develop SIPs to clean up $PM_{10}$ air

pollution in nonattainment areas by certain dates.  See 42 U.S.C. § 7513, et seq. (setting forth specific provisions for $PM_{10}$ nonattainment areas).

## II.  PM Pollution and Salt Lake County

49.    The Wasatch Front, including Salt Lake County, has long struggled with PM pollution.  In 1977, EPA designated the region as nonattainment for total suspended particulates, a type of PM.  See Utah SIP, Control Strategies, Fine Particulate Matter ($PM_{10}$), Section IX.A.1. As a result of the Clean Air Act Amendments of 1990, Salt Lake County was subsequently classified by operation of law as a moderate $PM_{10}$ nonattainment area due to violations of the 24-hour NAAQS.

50.    On July 8, 1994, EPA approved a SIP for Salt Lake County to address the area's $PM_{10}$ pollution.  See 59 Fed. Reg. 35306 (July 8, 1994).  That SIP promised to implement various measures to ensure compliance with, or attainment of the $PM_{10}$ NAAQS by December 31, 1994.

51.    EPA subsequently determined that Salt Lake County had attained the 24-hour $PM_{10}$ NAAQS as of December 31, 1995.  See 66 Fed. Reg. 32752 (June 18, 2001).  However, beginning in 2001, Salt Lake County again began experiencing exceedances of the $PM_{10}$ NAAQS that resulted in violations at least two monitoring sites, including one in Magna and one in North Salt Lake City.

52.    According to EPA, "[a]t least one Salt Lake County monitor has been in violation of the $PM_{10}$ NAAQS in every three-year period since 2001."  74 Fed. Reg. 62717, 62720 (Dec. 1, 2009).

53.    Based on the most recent data available from the State, EPA has determined that Salt Lake County is still violating the 24-hour $PM_{10}$ NAAQS every year.  See EPA, $PM_{10}$ Design Value Data.[3]

54.    As a result, Salt Lake County remains designated as nonattainment for the $PM_{10}$ NAAQS.  See 40 C.F.R. § 81.345.

**III.    Bingham Canyon Mine**

55.    The Bingham Canyon copper mine is one of the world's largest open pit copper mines.  The mine is located southwest of Salt Lake City in the Oquirrh Mountains in Salt Lake County.  According to Kennecott, the mine is more than 2.75 miles across the top and more than three quarters of a mile deep, and contains 500 miles of roads.  Activities at the mine include drilling and blasting, loading and hauling, and crushing and conveying.

56.    The Bingham Canyon copper mine is a stationary source of air pollution.  As such, the mine is subject to the provisions of the Utah SIP that was approved by EPA in 1994.  The Utah SIP notes that the mine annually releases 2,801 tons of $PM_{10}$, 78 tons of $SO_2$, and 4,048 tons of $NO_X$.  See Utah SIP, Section IX, Part A – Fine Particulate Matter ($PM_{10}$) Appendix A – Emission Limitations and Operating Practices, Section 2.2.W(18).

57.    Bingham Canyon is subject to the SIP because of mine's contribution to unhealthy levels of $PM_{10}$ in and around Salt Lake County.  When the SIP was approved in 1994, EPA noted that secondary nitrates and primary $PM_{10}$ emissions from the mining operations contributed to high levels of $PM_{10}$ in Salt Lake County.  See 59 Fed. Reg. 35306, 35307 (July 8, 1994).

---

[3] Available at http://www.epa.gov/airtrends/pdfs/PM10_DesignValues_20082010_Final.xlsx (last accessed Dec. 19, 2011).

58.     Among its other provisions, the SIP limits the mileage and size of haul trucks, curbs the sulfur content in diesel fuel, restricts visible emissions (also known as opacity), establishes particulate matter limits for a number of activities, and sets forth monitoring, recordkeeping, and reporting requirements for operations at the Bingham Canyon mine.  See Utah SIP, Section IX, Part A – Fine Particulate Matter ($PM_{10}$) Appendix A – Emission Limitations and Operating Practices, Section 2.2.W.

59.     Specifically, the Utah SIP limits total material moved at the Bingham Canyon mine, including ore and waste, to no more than 150,500,000 tons per 12-month period.  See Utah SIP, Section IX, Part A – Fine Particulate Matter ($PM_{10}$) Appendix A – Emission Limitations and Operating Practices, Section 2.2.W(2).  The SIP states that this production limit applies on a "rolling-annual total" basis.  A rolling-annual total basis means that for every month, a new 12-month total is calculated to determine compliance.  Id.

60.     Kennecott never challenged the Utah SIP in the appropriate United States Court of Appeals in accordance with the Clean Air Act and is bound by its provisions.

61.     The 150,500,000 ton limit on total material moved at the Bingham Canyon copper mine is today a part of the federally enforceable Utah SIP.

**IV.    Violations of the Utah SIP at the Bingham Canyon Mine**

62.     Starting at least in 2006, Kennecott began exceeding the 150,500,000 ton limit on total material moved at the Bingham Canyon copper mine.

63.     According to annual production records submitted by Kennecott to the Utah Division of Oil, Gas and Mining, total material moved, including ore and waste, at the Bingham Canyon copper mine equaled 163,000,000 tons in 2006, 158,960,310 tons in 2007, 169,468,050 tons in 2008, 192,684,252 tons in 2009, and 191,417,264 tons in 2010.

64.     These data indicate that, based on a rolling 12-month time frame, Kennecott began violating the 150,500,000 ton limit on total material moved at the Bingham Canyon copper mine starting at least by January 1, 2007 and continues to so violate as of the date of this Complaint.

65.     Kennecott continues to violate the 150,500,000 ton limit on total material moved set forth in the Utah SIP.

66.     Kennecott has asserted that the State of Utah, through an approval order, permitted production increases at the Bingham Canyon copper mine that allow it to violate the 150,500,000 ton limit on total material moved.

67.     EPA, however, has never approved a revision to the Utah SIP limit of 150,500,000 tons of total material moved.  There has never been a federal rulemaking through which EPA promulgated a revision to the Utah SIP that revised or otherwise modified the 150,500,000 ton limit.

68.     To the extent that the Utah SIP allows the State of Utah to issue approval orders in accordance with UACR R307-3.1, the SIP is clear that the issuance of such an order "does not relieve any owner or operator of the responsibility to comply with the provisions of these regulations or the *State Implementation Plan* or other local, state and/or Federal requirements." UACR, R307-1-3.1.4 (emphasis added).  Moreover, regardless of the language of the SIP, under federal law, the State may not unilaterally change emission limits and other provisions of the SIP.

69.     Furthermore, where a Utah-issued approval order conflicts with a SIP and specifically in the context of the 1994 SIP approval, EPA has made clear that, "should different emission limitations exist...the more stringent of the two (or more) emission limitations [will be

enforced]."  59 Fed. Reg. 35036, 35042 (July 8, 1994).  This is because "EPA must have assurance that the attainment demonstration of a nonattainment area plan is maintained.  The less stringent emission limitation may not provide that assurance without a reanalysis of the attainment demonstration."  Id.

70.     Thus, to the extent that the State of Utah has allowed production increases at the Bingham Canyon copper mine, such permitting actions have not revised, modified, or otherwise supplanted the Utah SIP and have not obviated the need for Kennecott to comply with the Utah SIP.

71.     Citizen Groups provided Kennecott, the EPA Administrator, and the State of Utah written notice of the violations at the Bingham Canyon mine.  More than 60-days have passed since Kennecott, the Administrator, and the State received notice.

72.     Neither the State of Utah nor the EPA have commenced or are diligently prosecuting a civil action in a court of the United States or the State of Utah to enforce the violations at the Bingham Canyon mine.

## **CLAIM FOR RELIEF**

**Violation of the Clean Air Act**
**Failure to Comply with the Utah State Implementation Plan.**

73.     Citizen Groups incorporate by reference the allegations in all preceding paragraphs of this Complaint.

74.     Kennecott has been and continues to be obligated to limit total material moved, including ore and waste, at the Bingham Canyon copper mine to no more than 150,500,000 tons over a 12-month period on a rolling basis in accordance with the Utah SIP.

75.     Kennecott has moved more than 150,500,000 tons of material at the Bingham Canyon copper mine over every 12-month period on a rolling basis starting on January 1, 2007.

Kennecott is continuing to move more than 150,500,000 tons of material at the Bingham Canyon copper mine over a 12-month period on a rolling basis.

76.     Kennecott has therefore failed to comply, and continues to fail to comply, with the Utah SIP.

77.     Kennecott's failure to comply with the Utah SIP also violates the Clean Air Act. 42 U.S.C. § 7604(a)(1)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A.     Declare that Kennecott violated and continues to violate the Utah SIP and the Clean Air Act by exceeding the 150,500,000 ton limit on total material moved over a 12-month rolling basis at the Bingham Canyon copper mine;

B.     Declare that Kennecott violated the Utah SIP and the Clean Air Act by exceeding the 150,500,000 ton limit on total material moved at the Bingham Canyon copper mine on every day from January 1, 2007 to the present;

C.     Declare that Kennecott violated the Utah SIP and the Clean Air Act for any exceedances of the 150,500,000 ton limit on total material moved at the Bingham Canyon copper mine that occur during the pendency of this proceeding;

D.     Enjoin Kennecott from violating the Utah SIP limit of 150,500,000 tons of total material moved at the Bingham Canyon copper mine;

E.     Order Kennecott to comply with the Utah SIP limit of 150,500,000 tons of total material moved at the Bingham Canyon copper mine;

F.     Assess civil penalties against Kennecott of up to $37,500 per violation per day for any and all violations of the Utah SIP limit of 150,500,000 tons of total material moved;

G.    Award Plaintiffs their reasonable fees, costs, expenses, and disbursements,

including attorneys' fees, associated with this litigation pursuant to the Clean Air Act, 42 U.S.C.

§ 7604(d); and

H.    Grant such additional and further relief as the Court may deem just and

appropriate.

Dated: December 19, 2011

Respectfully submitted,

/s/ Joro Walker
150 South 600 East, Ste. 2A
Salt Lake City, Utah  84102
801.487.9911
jwalker@westernresources.org

*Attorney for Utah Physicians for a Healthy
Environment and Utah Moms for Clean Air*

Samantha Ruscavage-Barz
NM Bar. No. 23276 (pro hac vice application
pending)
WildEarth Guardians
516 Alto Street
Santa Fe, NM 87501
Tel. 505-988-9126 x1158/Fax 505-213-1895
sruscavagebarz@wildearthguardians.org

*Attorney for WildEarth Guardians*

Plaintiff Addresses:

Utah Physicians for a Healthy Environment          Utah Moms for Clean Air
4091 Splendor Way                                  1755 Michigan Ave
Salt Lake City, Utah 84124                         SLC, Utah 84108

                                                   WildEarth Guardians
                                                   516 Alto Street
                                                   Santa Fe, NM 87501

21