PARSONS BEHLE & LATIMER
Michael L. Larsen (4069)
Michael A. Zody (5830)
Jacob A. Santini (12650)
201 South Main Street, Suite 1800
Salt Lake City, UT  84111
Telephone: (801) 532-1234
Facsimile: (801) 536-6111

DAVIS GRAHAM & STUBBS LLP
John R. Jacus
1550 17th Street, Suite 500
Denver, CO 80202
(303) 892-7305

*Attorneys for Defendant*
*Kennecott Utah Copper LLC*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UTAH PHYSICIANS FOR A HEALTHY ENVIRONMENT, WILDEARTH GUARDIANS, UTAH MOMS FOR CLEAN AIR, and SIERRA CLUB,<br><br>          Plaintiffs,<br><br>vs.<br><br>KENNECOTT UTAH COPPER  LLC,<br><br>          Defendant. | **KENNECOTT UTAH COPPER LLC'S MOTION FOR SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM**<br><br><br>Case No.  2:11-cv-01181-RJS<br><br>Honorable Judge Robert J. Shelby |

4818-3270-0690.1

# TABLE OF CONTENTS

**Page**

RELIEF SOUGHT ...................................................................................................... 1

INTRODUCTION ...................................................................................................... 1

BACKGROUND ....................................................................................................... 4

I.      THE CLEAN AIR ACT ................................................................................... 4

        A.      Cooperative Federalism:  the Role of EPA and the State ..................... 4

        B.      Federal Setting of the NAAQS ............................................................. 5

        C.      SIP Permit Programs ............................................................................. 5

        D.      Challenging and Revising a SIP ........................................................... 6

II.     UTAH'S PM$_{10}$ SIP ......................................................................................... 7

        A.      Utah's Permit Program ......................................................................... 7

        B.      The Material Moved Limit in the 1994 PM$_{10}$ SIP ................................ 9

        C.      1999 AO Authorizing Increase to 197,000,000 Tons/Year ................... 9

        D.      2011 AO Authorizing Increase to 260,000,000 Tons/Year ................. 10

STATEMENT OF ELEMENTS AND UNDISPUTED MATERIAL FACTS ........................ 12

ARGUMENT ......................................................................................................... 13

I.      LEGAL STANDARD FOR SUMMARY JUDGMENT ................................................ 13

II.     PLAINTIFFS' CLAIM MUST BE DISMISSED BECAUSE:  (1) KUC IS IN
        FULL COMPLIANCE WITH THE SIP AND (2) JURISDICTION IS LACKING
        OVER PLAINTIFFS' ATTACK ON THE SIP ............................................................ 14

        A.      Summary Judgment Should Be Granted Because KUC Is in Compliance
                With the Unambiguous, Plain Language of the SIP ............................ 16

        B.      Jurisdiction Is Lacking Over Plaintiffs' Claim That the SIP Violates the
                Clean Air Act ...................................................................................... 18

III.    PLAINTIFFS' ATTEMPT TO AVOID THE PLAIN LANGUAGE OF THE SIP
        IS UNAVAILING ............................................................................................. 20

        A.      The Courts Recognize That When a SIP Grants a State Authority To Make
                Adjustments, Exercising That Authority Is Not a SIP Revision, But Rather
                Implementation .................................................................................... 21

        B.      EPA's 1994 Preamble Statement Is Inapplicable and Cannot Alter the
                Plain Language of the SIP .................................................................... 26

CONCLUSION ....................................................................................................... 29

## TABLE OF AUTHORITIES

Page(s)

**FEDERAL STATUTES**

42 U.S.C. §§ 7401 – 7515 ................................................................................................4

42. U.S.C. § 7401(a) .......................................................................................................4

42 U.S.C. § 7407(a) ........................................................................................................4

42 U.S.C. § 7407(c) ........................................................................................................5

42 U.S.C. § 7407(d) ........................................................................................................5

42 U.S.C. § 7408(a) ........................................................................................................4

42 U.S.C. § 7409(a) ........................................................................................................4

42 U.S.C. § 7409(b) ........................................................................................................4

42 U.S.C. §§ 7410(a) ....................................................................................................5-6

42 U.S.C. § 7410(c) ........................................................................................................4

42 U.S.C. § 7410(i) ...........................................................................................20, 21, 22

42 U.S.C. § 7410(k) ......................................................................................................4, 6

42 U.S.C. § 7502(c) ........................................................................................................5

42 U.S.C. § 7604(a) ........................................................................1, 6, 14, 16, 18, 25

42 U.S.C. § 7604(f) .................................................................................................14, 15

42 U.S.C. § 7607(b) .............................................................................................6, 7, 15, 18

**CODE OF FEDERAL REGULATIONS**

40 C.F.R. §§ 50.4 – 50.17 (2012) ..................................................................................5

40 C.F.R. § 50.6 (2012) ..................................................................................................5

40 C.F.R. § 50.7 (2012) ..................................................................................................5

40 C.F.R. § 50.13 (2012) ................................................................................................5

40 C.F.R. § 51.160 (2012) .................................................................................6

40 C.F.R. § 52.2320 – 52.2355 (2012) ...............................................................7

40 C.F.R. § 52.2320(c)(25) (2012) ...............................................................7, 8, 9

40 C.F.R. § 52.2323(c)(59) (2012) ......................................................................8

**FEDERAL REGISTER DOCUMENTS**

59 Fed. Reg. 35036 (July 8, 1994)..................................................7, 8, 26, 28

66 Fed. Reg. 32752 (June 18, 2001) ..........................................................3, 28-29

70 Fed. Reg. 59681 (proposed October 13, 2005) ...............................................8

75 Fed. Reg. 70888 (proposed November 19, 2010) ...........................................7

76 Fed. Reg. 21639 (April 18, 2011) ..................................................................7

**UTAH STATUTES**

Utah Code Ann. § 19-2-108 (1998) ....................................................................8

Utah Code Ann. § 19-2-108 (2010) ....................................................................8

Utah Code Ann. § 63-46b-1 to -22 (1997)...........................................................8

Utah Code Ann. § 63G-4-101 to -601 (2011) ......................................................8

**UTAH ADMINISTRATIVE CODE**

Utah Administrative Code R307-1-3.1 (1992) ...............................................7, 8, 9

Utah Administrative Code R307-102-3 (2000) ....................................................8

Utah Administrative Code R307-103-1 to -14 (2011)..........................................8

Utah Administrative Code R307-401 (as reproduced on EPA's website)....................................7

Utah Administrative Code R446-1-3.1 (1991) ....................................................7

**UTAH STATE BULLETIN**

1998-11 Utah Bull. 3 (June 1, 1998).................................................................7

## CASES

*Am. Trucking Ass'n, Inc. v. EPA*,
   283 F.3d 355 (D.C. Cir. 2002) ................................................................5

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) .................................................................13, 14

*BCCA Appeal Grp. v. EPA*,
   355 F.3d 817 (5th Cir. 2003) ................................................................5

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) .................................................................13, 14

*Delaware Valley Citizens Council for Clean Air v. Davis*,
   932 F.2d 256 (3d Cir. 1991) ...............................................................16

*El Comite Para El Bienestar De Earlimart v. Warmerdam*,
   539 F.3d 1062 (9th Cir. 2008) .......................................................17, 27

*First Nat'l Bank of Ariz. v. Cities Serv. Co.*,
   391 U.S. 253 (1968) .........................................................................13

*Luminant Generation Co. v. EPA*,
   675 F.3d 917 (5th Cir. 2012) ...........................................................4, 19

*Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) .........................................................................13

*McKnight v. Kimberly Clark Corp.*,
   149 F.3d 1125 (10th Cir. 1998) ...........................................................14

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*,
   551 U.S. 644 (2007) .........................................................................17

*Nat'l Parks Conservation Ass'n, Inc. v. Tenn. Valley Auth.*,
   175 F. Supp. 2d 1071 (E.D. Tenn. 2001) .......................................... 24-25

*Natural Res. Def. Council, Inc. v. S. Coast Air Quality Mgmt. Dist.*,
   651 F.3d 1066 (9th Cir. 2011) .............................................6, 14-15, 17, 26-27

*Romoland Sch. Dist. v. Inland Empire Energy Ctr., LLC*,
   548 F.3d 738 (9th Cir. 2008) ...............................................................15

*Safe Air for Everyone v. EPA*,
   488 F.3d 1088 (9th Cir. 2007) .............................................................17

*Texas v. EPA*,
   690 F.3d 670 (5th Cir. 2012) .................................................................................5, 6, 19, 25

*Tierdael Constr. Co. v. Occupational Safety and Health Review Comm'n,*
   340 F.3d 1110 (10th Cir. 2003) ............................................................................... 16-17

*Time Warner Entm't Co. v. Everest Midwest Lincesee, L.L.C.,*
   381 F.3d 1039 (10th Cir. 2004) .........................................................................................17

*US Magnesium, LLC v. EPA,*
   690 F.3d 1157 (10th Cir. 2012) ................................................................................. 4-5, 6, 7

*United States v. AM Gen. Corp.,*
   34 F.3d 472 (7th Cir. 1994) ...............................................................................................25

*United States v. Cinergy Corp.,*
   623 F.3d 455 (7th Cir. 2010) ....................................................................................... 27-28

*United States v. Ford Motor Co.,*
   736 F. Supp. 1539 (W.D. Mo. 1990) ........................................................................ 21, 23-24

*United States v. General Motors Corp.,*
   702 F. Supp. 133 (N.D. Tex. 1988) .......................................................................... 21-23, 24

*United States v. Solar Turbines, Inc.,*
   732 F. Supp. 535 (M.D. Pa. 1989) .....................................................................................25

*United Steelworkers v. Oregon Steel Mills, Inc.,*
   322 F.3d 1222 (10th Cir. 2003) .....................................................................................16, 18

*Utah Chapter of the Sierra Club v. Air Quality Bd.,*
   226 P.3d 719 (Utah 2009) ...................................................................................................9

*Walker Stone Co. v. Sec'y of Labor,*
   156 F.3d 1076 (10th Cir. 1998) ..........................................................................................17

*Washington Envtl. Council v. Sturdevant,*
   834 F. Supp. 2d 1209 (W.D. Wash. 2011)............................................................................17

*Wilder v. Thomas,*
   854 F.2d 605 (2d Cir. 1988)................................................................................................15

**RELIEF SOUGHT**

Defendant Kennecott Utah Copper LLC ("KUC") moves for summary judgment under Rule 56 of the F.R.Civ.P. dismissing Plaintiffs' case in its entirety, with prejudice. The Court was informed during the initial scheduling conference that all the parties considered the liability phase of this case—Phase I—to turn on a pure legal question, which if decided in KUC's favor, is dispositive of all issues. The parties further anticipated that the filing of cross motions for summary judgment was the appropriate mechanism for submitting the narrow issue of law to the Court for determination. That narrow legal issue can be stated as follows: Did KUC violate the Clean Air Act by obtaining and complying with Approval Orders issued by the State of Utah in compliance with the express provisions set forth in the federally-approved Utah State Implementation Plan ("SIP")?

**INTRODUCTION**

This is a Clean Air Act ("CAA") citizen suit filed under section 304(a)(1)(A) of the CAA, 42 U.S.C. § 7604(a)(1)(A) (2012). Plaintiffs allege KUC is in violation of a limitation in the 1994 Utah SIP. While a SIP limit can be enforced in a citizen suit, the law is clear that the limit must be enforced as written, and that a citizen suit cannot be used to challenge the SIP limit itself.

The SIP limit at issue in this case addresses the amount of ore and waste rock KUC can move at its Bingham Canyon Mine ("BCM" or "mine") in the southwest corner of the Salt Lake Valley. The limit, implemented in 1994 and unchanged since then, reads as follows:

> Total material moved (ore and waste) shall not exceed 150,500,000 tons per 12-month period ***without prior approval in accordance with Section 3.1, UACR*** [Utah Administrative Code Rules].

[KUC Appendix, Ex. No. 1, SIP, Section IX, Part A, Appendix A, Subsection 2.2.W.2 (emphasis added)].  One fundamental point is obvious from this language.  KUC is in compliance with the plain language of the SIP if KUC *either* (1) stays under 150,500,000 tons per year *or* (2) obtains "prior approval" to exceed this amount under Section 3.1, UACR.  Section 3.1, UACR, is the EPA-approved Utah pollution permitting program, itself part of the SIP, that grants authority to the State of Utah to issue air permits, provided several conditions protective of the airshed have been met.

Plaintiffs do not dispute that in 1999 and 2011 KUC obtained "prior approvals" under Section 3.1, UACR, in the form of "Approval Orders" issued by the Executive Secretary of the Utah Air Quality Board.  The 1999 Approval Order ("AO") authorized KUC to move up to 197,000,000 tons of ore and waste rock per year, while the 2011 AO authorizes KUC to move up to 260,000,000 tons of ore and waste rock per year.  No party challenged either AO within the 30-day challenge period, and both became final orders.  It is undisputed that KUC has remained in compliance with the applicable limits in the 1999 and 2011 AOs.  Accordingly, based upon the plain language of the SIP as written, KUC is in full compliance with the SIP and is entitled to summary judgment dismissing this case.

Plaintiffs attempt to get around the plain meaning of the SIP by arguing that notwithstanding the clear grant of authority to the State of Utah to authorize KUC, in accordance with the State's federally-approved permit program, to move more than 150,500,000 tons of ore and waste rock per year, any such exercise of authority amounts to a SIP "revision" that EPA has to approve before it is effective, and otherwise violates the CAA.  Plaintiffs' arguments have been soundly rejected under well-established CAA jurisprudence.

Where, as here, EPA approves a SIP that grants authority to a state to adjust an operational limit, the language of the SIP is enforced as written.  In fact, when discussing Utah's authority to adjust operational limits found in the SIP, EPA acknowledged such SIP language must be implemented as it is written:   "We believe *SIP implementation must be evaluated against the SIP as written*, even though we may not agree with all SIP terms."  66 Fed. Reg. 32752, 32759/2 (June 18, 2001) (emphasis added).  In sum, the exercise of the grant of authority to the State of Utah to increase the amount of material moved at KUC's mine does not revise the SIP in any way, it simply implements it.

Moreover, the fundamental premise of Plaintiffs' case—that a state cannot be given authority in a SIP to adjust source-specific operational limits—amounts to an attack on the SIP itself, which cannot be brought in a citizen suit action.  The law is clear on this point:  challenges to SIPs can only be filed in the federal courts of appeals, not in the district courts, which only have jurisdiction to enforce SIPs as written.  Finally, even if jurisdiction over a SIP challenge existed in this Court, Plaintiffs' assertion that the authority granted to the State of Utah in the SIP somehow violates the CAA is simply wrong.  Courts have consistently held that there is nothing in the CAA that prohibits a state from exercising authority granted to it in an EPA-approved SIP.

# BACKGROUND[1]

## I.     THE CLEAN AIR ACT

### A.     Cooperative Federalism:  the Role of EPA and the State

The CAA is often described as "an experiment in cooperative federalism," as it relies upon the work of both the states and EPA.  *Luminant Generation Co. v. EPA*, 675 F.3d 917, 921 (5th Cir. 2012) (internal quotation marks omitted); *US Magnesium, LLC v. EPA*, 690 F.3d 1157, 1159 (10th Cir. 2012).

Nowhere is the federal-state partnership more clear than in Chapter I of the Clean Air Act.  CAA §§ 101 - 191, 42 U.S.C. §§ 7401 - 7515.  Chapter I is focused on the identification of certain common air contaminants, known under the CAA as criteria pollutants.  *Id.* §§ 108(a)(1), 109(a), (b), §§ 7408(a)(1), 7409(a), (b).  The CAA charges EPA with the duty to identify these criteria pollutants and then set national standards for each of these pollutants adequate to protect public health.  *Id.*; *US Magnesium*, 690 F.3d at 1159.  These standards are known as the National Ambient Air Quality Standards ("NAAQS").

In turn, the CAA places the responsibility, and authority, to implement the NAAQS on the states.  CAA §§ 101(a)(3), 107(a), 42 U.S.C. §§ 7401(a)(3), 7407(a); *US Magnesium*, 690 F.3d at 1159.  Each state carries out its duty through the adoption of a SIP, which outlines how the state intends to attain and maintain the NAAQS.  *US Magnesium*, 690 F.3d at 1159.  The state is required to submit its SIP to EPA for approval.  CAA § 110(c), (k)(3), 42 U.S.C. § 7410(c), (k)(3); *US Magnesium*, 690 F.3d at 1159.  Once EPA has determined the SIP meets

---

[1]   Consistent with DUCivR 56-1(b), KUC includes this section for the limited purpose of providing background and context for the case, dispute, and motion.  The facts included in this section are not to be taken as the statement of undisputed material facts required by the local rules.  *See* DUCivR 56-1(b).

the requirements of the CAA and formally approves the SIP, the SIP is enforceable as federal law.  *US Magnesium*, 690 F.3d at 1159.

As the Fifth Circuit Court of Appeals recently stated "[t]he [CAA] and the EPA supply 'the goals and basic requirements of state implementation plans, but the states have broad authority to determine the methods and particular control strategies they will use to achieve the statutory requirements.'"  *Texas v. EPA*, 690 F.3d 670, 675 (5th Cir. 2012) (quoting *BCCA Appeal Grp. v. EPA*, 355 F.3d 817, 822 (5th Cir. 2003)).

### B.      Federal Setting of the NAAQS

To date, EPA has set NAAQS for six criteria pollutants, those being:  (1) carbon monoxide ("CO"); (2) lead; (3) nitrogen oxides ("NOx"); (4) ozone; (5) particulate matter ("PM"); and (6) sulfur dioxide ("$SO_2$").  40 C.F.R. §§ 50.4 - 50.17 (2012).  There are two separate NAAQS for PM, those being $PM_{10}$, which applies to particulate matter smaller than 10 micrometers in diameter, and $PM_{2.5}$, which applies to particulate matter smaller than 2.5 micrometers in diameter.  *Id.* §§ 50.6, 50.7, 50.13.[2]

Once EPA has set the NAAQS, the implementation process begins with the identification of areas as either "attainment," "nonattainment," or "unclassifiable."  CAA § 107(c), (d)(1)(A), 42 U.S.C § 7407(c), (d)(1)(A).  Attainment areas are those regions that have met, or attained, the NAAQS, whereas nonattainment areas have not.  *Id.* § 107(d)(1)(A)(ii), § 7407(d)(1)(A)(ii).

### C.      SIP Permit Programs

A SIP for a nonattainment area must contain numerous elements, the majority of which are found in CAA sections 110(a)(2) and 172(c).  42 U.S.C. §§ 7410(a)(2), 7502(c).  One of the

---

[2] Because of the size difference, $PM_{2.5}$ is often referred to as "fine PM" and $PM_{10}$ is often dubbed "coarse PM."  *Am. Trucking Ass'n, Inc. v. EPA*, 283 F.3d 355, 359 (D.C. Cir. 2002).

fundamental pieces of a SIP is the state's preconstruction permitting program, called a New Source Review ("NSR") program under the CAA, that regulates the construction and modification of stationary sources.  *Id*. § 110(a)(2)(C), § 7410(a)(2)(C); 40 C.F.R. §51.160; *Texas*, 690 F.3d at 674; *Natural Res. Def. Council, Inc. v. S. Coast Air Quality Mgmt. Dist.*, 651 F.3d 1066, 1069 (9th Cir. 2011).

> ### D.      Challenging and Revising a SIP

The CAA authorizes interested persons to challenge EPA's decision to approve a SIP, as well as the content of the SIP.  CAA § 307(b), 42 U.S.C. § 7607(b).  A party wishing to initiate a SIP challenge must file a petition for review within 60 days of EPA's final SIP approval.  *Id.* Additionally, the federal courts of appeal, not district courts, have exclusive jurisdiction over SIP challenges.  *Id.*

Once a SIP has been approved, there are two mechanisms that allow EPA to change it. First, EPA may require a state to revise a SIP after EPA finds—through notice-and-comment rulemaking—that the SIP is substantially inadequate to attain or maintain the NAAQS or comply with the CAA.  CAA § 110(k)(5), 42 U.S.C. § 7410(k)(5).  This action by EPA is commonly referred to as a "SIP call."  *US Magnesium*, 690 F.3d at 1160.  Second, EPA may issue a SIP correction, when EPA determines that approval of a SIP provision was in error.  CAA § 110(k)(6), 42 U.S.C. § 7410(k)(6).  A citizen may also move to force EPA to issue a SIP call by filing a citizen suit under CAA section 304(a)(2) alleging that EPA has failed to perform a non-discretionary act.  42 U.S.C. §7604(a)(2).  EPA has issued neither a SIP call, nor a SIP

correction, with respect to the limit at issue in this case, and no citizen has ever attempted to force EPA to remove the limit from Utah's SIP.[3]

## II.   UTAH'S PM$_{10}$ SIP

The entire EPA-approved Utah SIP is incorporated into the code of federal regulations at 40 C.F.R. § 52.2320 - 52.2355, which documents several decades of EPA action on SIP submissions by the State of Utah.[4]   Of specific relevance in this action, in 1994, EPA approved SIP provisions submitted by Utah to control PM$_{10}$ emissions in the Salt Lake County non-attainment area for the 24-hour PM$_{10}$ NAAQS.   *See* 40 C.F.R. § 52.2320(c)(25); *see also* 59 Fed. Reg. 35036 (July 8, 1994).   No party challenged EPA's approval of the Salt Lake County SIP within the 60 day window allowed under CAA section 307(b), and thus the SIP became final and federally enforceable, as written.

### A.   Utah's Permit Program

As part of its SIP, Utah implemented, and EPA approved, a preconstruction permitting program.[5]   Under its EPA-approved permit program, the State of Utah is authorized to issue

---

[3] Plaintiffs are well-aware of this process.   In September 2009, WildEarth Guardians filed an action against EPA in the U.S. District Court in Colorado alleging that Utah's "unavoidable breakdown rule" was contrary to the CAA and EPA was obligated to force Utah to revise the provision through a SIP call.   75 Fed. Reg. 70888, 70891/2 (proposed November 19, 2010).   The following month, EPA entered into a consent decree settling that suit.   *Id.*   Ultimately, EPA agreed with WildEarth Guardians by issuing a SIP call that required UDAQ to revise the state rule.   76 Fed. Reg. 21639 (April 18, 2011).   That SIP call became the basis for the Tenth Circuit's decision in *US Magnesium*.   690 F.3d at 1161-63.

[4]   The   text   of   Utah's   federally-approved   SIP   can   be   found   at, http://www.epa.gov/region8/air/sip.html.

[5] Utah originally codified its permitting program as Utah Administrative Code Rule 446-1-3.1 (1991).   In 1992, Utah renumbered those regulations as UAC R307-1-3.1 and again in 1998 as UAC R307-401-1, *et seq*.   UAC R307-1-3.1 (1992); *see* 1998-11 Utah Bull. 3 (June 1, 1998) (providing   a   cross   reference   between   the   renumbered   rules   and   their   prior   regulatory

permits, called Approval Orders ("AOs"), to new or modified sources of air pollution. *See* Utah

Admin. Code R307-1-3.1 ("Section 3.1, UACR") [KUC App., Ex. No. 2].     During the

timeframe relevant to this case, the authority to issue AOs was vested with the Executive

Secretary of the Utah Air Quality Board.   Before issuing a final AO, the notice of intent to

approve the draft AO had to be copied to EPA so it could review and comment, and it had to be

noticed for at least 30 days of public comment, during which time the public was allowed to

review the permit application, the draft AO and the State's analysis of the same. *Id.* R307-1-

3.1.3.   In addition, before issuing an AO, the Executive Secretary was required to find that

several conditions protective of air quality had been satisfied. *Id*. R307-1-3.1.6, -.8.

Under the rules in effect during the relevant timeframe,[6] any person wishing to challenge

an AO had to file an appeal within 30 days of the issuance of the AO.   Filing an appeal triggered

an administrative hearing process under the Utah Administrative Procedures Act and the Utah

Air Quality Act and corresponding regulations.   The challenger could seek discovery and present

factual, technical and legal arguments at a hearing as to why it believed the AO should not have

---

codification); 40 C.F.R. § 52.2320(c)(25) (approving Utah's $PM_{10}$ SIP and incorporating the regulations that existed on Jan. 27, 1992); 59 Fed. Reg. 35044 (providing notice of final approval of Utah's $PM_{10}$ SIP, which included the state's preconstruction permit program); 40 C.F.R. §52.2320(c)(59) (approving revisions to R307-401-9 and -10 but declining to adopt the renumbering of the rest of R307-1-3.1); 70 Fed. Reg. 59681, 59687-88 (proposed October 13, 2005) (stating that R307-1-3.1.1 to -3.1.6, and -3.1.8 to -3.1.10 remain as enforceable provisions of the SIP); *see also* Region 8:   EPA's Air Pollution State Implementation Plans, Utah R307-401, available at EPA's SIP website, *supra* note 4 (providing the EPA-approved version of Utah's preconstruction permitting program and stating that the majority of R307-1-3.1 remains effective) [KUC App., Ex. No. 2].

[6] The statutes and rules in effect during 1999 were Utah Code Ann. § 19-2-108(3) (1998); § 63-46b-1 to -22 (1997); and Utah Admin. Code R307-102-3(1)(a), (3) (2000). The statutes and rules in effect during 2011 were Utah Code Ann. § 19-2-108(3) (2010); § 63G-4-101 to -601 (2011); and Utah Admin. Code § R307-103-1 to -14 (2011).

been issued.  The Utah Air Quality Board was the final agency decision maker, and an appeal

from the Board's decision went to Utah's appellate courts.  Failure to challenge an AO within 30

days resulted in the AO being final.  *See*, *e.g.*, *Utah Chapter of the Sierra Club v. Air Quality

Bd.*, 226 P.3d 719, 723-25 (Utah 2009) (detailing the extensive administrative litigation and

appeal process available to challenge an AO, pursued in that case by one of the Plaintiffs in this

case, the Sierra Club).

        **B.**      **The Material Moved Limit in the 1994 $PM_{10}$ SIP**

      The 1994 $PM_{10}$ SIP contains "Emissions Limitations and Operating Practices" for several

$PM_{10}$ sources, including the Bingham Canyon Mine ("BCM").[7]  The limitation placed upon

material moved (ore and waste rock) at the BCM expressly delegates authority to the State of

Utah to allow the initial limit to be exceeded, if KUC obtains prior approval under Utah's air

permit program.  Specifically, the SIP provides:

> Total material moved (ore and waste) shall not exceed 150,500,000
> tons per 12-month period ***without prior approval in accordance
> with Section 3.1, UACR***.

$PM_{10}$ SIP, Section IX.A, Appendix A - Emission Limitations and Operating Practices,

Subsection 2.2.W.2 (emphasis added) [KUC App., Ex. No. 1].[8]

        **C.**      **1999 AO Authorizing Increase to 197,000,000 Tons/Year**

      On February 23, 1999, in compliance with Section 3.1, UACR, KUC submitted a "Notice

of Intent to Increase Annual Ore and Waste Rock Production at the Kennecott Utah Copper

---

[7] *See* Utah State Implementation Plan, Section IX, Part A - Fine Particulate Matter ($PM_{10}$)
Appendix A.  40 C.F.R. § 52.2320(c)(25)(i)(C).  Section 2.2.W of Appendix A covers the
conditions applicable to the BCM.

[8] As explained in Section III.A., *infra*, EPA has approved SIPs in other states that authorize those
states to adjust operational limits as well.

Bingham Canyon Mine" ("1999 NOI") to the Utah Division of Air Quality.  [KUC App., Ex. No. 3].[9]  The 1999 NOI provided detailed technical information to support KUC's request to exceed 150,500,000 tons of material moved per year, and to increase to 197,000,000 tons per year, in compliance with the requirements of Section 3.1, UACR.

On May 11, 1999, the Utah Division of Air Quality issued its Intent to Approve ("1999 ITA") the 1999 NOI.  [KUC App., Ex. No. 5].  The 1999 ITA was copied to EPA and explained the public comment process that would be followed before the Executive Secretary would consider final approval of the draft AO.  The Abstract to the draft AO explained that the NOI has been "evaluated and has been found to be consistent with the requirements of the Utah Air Quality Rules (UAQR) and the Utah Air Conservation Act."  1999 ITA, at 2.  The Abstract noted that the calculated net increase in emissions would be "offset by the emission reduction credits banked as a result of the Smelter and Refinery Modernization."  *Id.*

On October 6, 1999, the Executive Secretary of the Utah Air Quality Board issued the final "Approval Order for Increase of Annual Ore and Waste Rock Production" ("1999 AO").  [KUC App., Ex. No. 6].  The final Abstract explained that a 30-day public comment period had been held and that all applicable requirements had been met.  The 1999 AO authorized KUC to increase material moved at the BCM to 197,000,000 tons per year.  No one challenged the 1999 AO within the 30-day challenge period and the AO became a final order.

### D.    2011 AO Authorizing Increase to 260,000,000 Tons/Year

KUC operated under, and in compliance with, the 1999 AO for over twelve years, with no challenges being filed by any citizen groups or the EPA.  By 2010 KUC had decided to

---

[9] On March 26, 1999, KUC submitted an amendment to the 1999 NOI.  [KUC App., Ex. No. 4].

pursue a mine life extension project.  In connection with this project, KUC needed to increase the amount of material moved at the BCM once again.

KUC submitted an NOI, in compliance with Section 3.1, UACR, in August of 2010, which it revised in January 2011, entitled "Notice of Intent Application, Bingham Canyon Mine Expansion" ("2011 NOI").  [KUC App., Ex. No. 7].  The 2011 NOI provided detailed technical information to support KUC's request to increase to 260,000,000 tons of material moved per year, in compliance with the requirements of Section 3.1, UACR.

On February 2, 2011, the Utah Division of Air Quality issued its Intent to Approve ("2011 ITA") the 2011 NOI.  [KUC App., Ex. No. 8].  The 2011 ITA was copied to EPA and explained the public comment and hearing process that would be followed before the Executive Secretary would consider final approval of the draft AO.  The Abstract to the draft AO explained that the NOI has been "evaluated and has been found to be consistent with the requirements of UAC R307," which included renumbered Section 3.1, UACR.  *Id.* at 2.  The Utah Division of Air Quality received public comments on the 2011 ITA, including from the Plaintiffs in this case and EPA, and prepared detailed responses to those comments.  [KUC App., Ex. No. 9].

On June 27, 2011, the Executive Secretary of the Utah Air Quality Board issued the final "Approval Order:  Modify Approval Order DAQE-AN015710023-08 to Allow for Material Movement Increase and Add a Crusher" ("2011 AO").  [KUC App., Ex. No. 10].  The Abstract to the 2011 AO explained that the AO was being issued pursuant to the terms of the 1994 SIP that granted authority to the State of Utah to increase the amount of material moved at the BCM.  *Id.* at 2.  No one challenged the 2011 AO within the 30-day challenge period and the AO became a final order.  KUC has been operating in compliance with the 2011 AO since its issuance.

Plaintiffs in this action do not challenge the validity of the 1999 or the 2011 AOs issued under Section 3.1, UACR.  *See* First Amended Complaint ("FAC"), February 9, 2012, dkt. no. 16 (which generally ignores the 1999 and 2011 AOs, and nowhere challenges the validity of the issuance of the AOs under Section 3.1, UACR).

## STATEMENT OF ELEMENTS AND UNDISPUTED MATERIAL FACTS

### Legal Authority Supporting Summary Judgment

1.      The 1994 $PM_{10}$ SIP applicable to KUC, Section IX, Part A, Appendix A, Subsection 2.2.W.2 provides:   "Total material moved (ore and waste) shall not exceed 150,500,000 tons per 12-month period ***without prior approval in accordance with Section 3.1, UACR***."  ("material moved limit") (emphasis added).  [KUC App., Ex. No. 1].

### Facts That Show KUC Is in Full Compliance With the SIP

2.      In 1999, in accordance with Section 3.1, UACR, KUC applied for and received approval to exceed 150,500,000 tons per 12-month period.  Specifically, on October 6, 1999, the Executive Secretary of the Utah Air Quality Board issued the final "Approval Order for Increase of Annual Ore and Waste Rock Production."  [KUC App., Ex. No. 6].  The 1999 AO authorized KUC to increase material moved at the BCM to 197,000,000 tons per year.  The 1999 AO was not challenged as allowed under the rules.

3.      In 2011, in accordance with Section 3.1, UACR, KUC applied for and received approval to exceed 197,000,000 tons per 12-month period.  Specifically, on June 27, 2011, the Executive Secretary of the Utah Air Quality Board issued the final "Approval Order:  Modify Approval Order DAQE-AN015710023-08 to Allow for Material Movement Increase and Add a Crusher."  [KUC App., Ex. No. 10].  The 2011 AO authorized KUC to increase material moved

at the BCM to 260,000,000 tons per year.  The 2011 AO was not challenged as allowed under the rules.

4.      KUC has remained in compliance with the material moved limit at all times. KUC remained under 150,500,000 tons per year until it received the 1999 AO.  After that, KUC remained under 197,000,000 tons per year until it received the 2011 AO.  After that and to the present, KUC has remained under 260,000,000 tons per year.  *See* FAC, ¶ 64.  Plaintiffs do not allege KUC has ever violated the material movement approvals given by the State of Utah in the 1999 and 2011 AOs.  *See* FAC.

## ARGUMENT

## I.      LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate where, as here, there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has met this initial burden, the burden shifts to the nonmoving party to "'set forth specific facts showing that there is a genuine issue for trial.'"  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)).  In doing so, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Accordingly, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252.

The United States Supreme Court has held that a party opposing summary judgment "may not rest upon the mere allegations or denials of his pleadings, but . . . must set forth the specific facts showing that there is a genuine issue of material fact for trial." *Id.* at 248 (internal quotation marks omitted). The nonmovant is required to go beyond the pleadings and identify specific facts that support each essential element of the nonmovant's case. *See McKnight v. Kimberly Clark Corp.,* 149 F.3d 1125, 1128 (10th Cir. 1998). "The plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Thus, summary judgment is not viewed as a "disfavored procedural shortcut." *Id.* at 327. Rather, it is "an integral part of the Federal Rules as a whole." *Id.*

## II.     PLAINTIFFS' CLAIM MUST BE DISMISSED BECAUSE:  (1) KUC IS IN FULL COMPLIANCE WITH THE SIP AND (2) JURISDICTION IS LACKING OVER PLAINTIFFS' ATTACK ON THE SIP.

Plaintiffs are pursuing their claim under section 304(a)(1) of the CAA, 42 U.S.C. § 7604(a)(1). FAC, ¶ 10. To prevail, Plaintiffs must show KUC is in "violation of (A) an emission standard or limitation under this chapter. . . ." CAA § 304(a)(1)(A), 42 U.S.C. § 7604(a)(1)(A). Plaintiffs rely upon the definition of emission standard or limitation under section 304(f)(4) which includes "any other standard, limitation, or schedule . . . under any applicable State implementation plan approved by the Administrator. . . ." *Id.* at 7604(f)(4); FAC, ¶ 39.

The courts are very careful to make sure citizens suing under section 304(a) are in fact alleging a violation of an emission standard or limitation. If citizens are not doing so, then the

district court has no jurisdiction to hear the matter.  *See Natural Res. Def. Council, Inc. v. S. Coast Air Quality Mgmt. Dist.*, 651 F.3d 1066, 1071-72 (9th Cir. 2011) (hereinafter "*NRDC v. SCAQMD*") (holding that the district court lacked jurisdiction over a citizen suit alleging that a local air agency's system of calculating and recording Emission Reduction Credits was invalid because the allegations did not fit within any of the section 304(f) definitions of "emission standard or limitation"); *Wilder v. Thomas*, 854 F.2d 605, 613 (2d Cir. 1988) (noting that while the CAA expanded the district court's jurisdiction over citizen suits by circumventing diversity and jurisdictional amount, Congress also "carefully circumscribed the scope of [section 304] by authorizing citizens to bring suit only for violations of . . . specific provisions of an applicable [SIP]" in order to avoid interference with the implementation of the CAA).

        In SIP cases like this one, citizens often purport to be challenging compliance with a SIP limit, when in fact they are really attacking the very SIP itself.  The courts are clear that if citizens are attacking a SIP, then the district courts have no jurisdiction, and any such attack upon the SIP can only be filed in a federal court of appeals under section 307(b)(1) of the CAA. *See* CAA § 307(b)(2), 42 U.S.C. § 7607(b)(2) ("Action of [EPA] with respect to which review could have been obtained under paragraph (1) [section 307(b)(1)] shall not be subject to judicial review in civil or criminal proceedings for enforcement.");  *NRDC v. SCAQMD*, 651 F.3d at 1070 ("Whenever [section] 307 review could have been obtained, 'this form of judicial review is exclusive . . . [and] foreclose[s] the alternative avenue of citizen suit enforcement through 42 U.S.C. § 7604 [CAA § 304].'" (quoting *Romoland Sch. Dist. v. Inland Empire Energy Ctr., LLC*, 548 F.3d 738, 755 (9th Cir. 2008) (alterations and omission in original)).

The Tenth Circuit Court of Appeals has weighed in on this issue as well. In *United Steelworkers v. Oregon Steel Mills, Inc.*, the Tenth Circuit stated that the "plain language of [section] 307(b)(2) indicates that it is meant to prevent a party from challenging an EPA ruling via a district court proceeding." 322 F.3d 1222, 1225 (10th Cir. 2003). Moreover, "in most cases where the district court was divested of jurisdiction under [section] 307(b)(2), the plaintiff was seeking to challenge the EPA's ruling, either through a direct challenge or a ***cleverly packaged citizen suit***." *Id.* (emphasis added).[10] As the Tenth Circuit noted, quoting the Third Circuit, "'citizens who claim that [CAA] standards themselves are inadequate must petition the appropriate court of appeals pursuant to [section] 7607, while citizens who merely wish to enforce the [CAA] standards may sue in district court pursuant to [section] 7604.'" *Id.* at 1226 (quoting *Del. Valley Citizens Council for Clean Air v. Davis,* 932 F.2d 256, 265 (3d Cir. 1991)). Thus, if Plaintiffs' challenge here is merely to question whether KUC is in compliance with the SIP as written, which includes the express authority granted to the State to adjust the amount of material moved through the AO process, then that narrow issue is within the jurisdiction of this Court under section 7604. However, if Plaintiffs are really attacking the SIP itself and the legality of the authority expressly granted to the State of Utah, then, as the Tenth Circuit has clearly held, it is exclusively a matter within the jurisdiction of the appropriate court of appeals.

A. <u>Summary Judgment Should Be Granted Because KUC Is in Compliance With the Unambiguous, Plain Language of the SIP.</u>

Plaintiffs claim that KUC is violating the SIP. FAC, ¶¶ 74-78. Accordingly, the starting point in assessing Plaintiffs' claim is the plain language of the SIP. If the language is clear and

---

[10] In *United Steelworkers*, the court found that the claims were within bounds of section 304(a) because the plaintiffs sought to enforce regulations that were already in effect, as opposed to attempting to challenge an EPA action. *Id.* at 1226.

unambiguous, then there is nothing further to do but to enforce it as written.  *See Tierdael Constr. Co. v. Occupational Safety and Health Review Comm'n,* 340 F.3d 1110, 1114 (10th Cir. 2003) ("'When the meaning of a regulatory provision is clear on its face, the regulation must be enforced in accordance with its plain meaning.'" (quoting *Walker Stone Co. v. Sec'y of Labor*, 156 F.3d 1076, 1080 (10th Cir. 1998))); *NRDC v. SCAQMD*, 651 F.3d at 1072 ("'In interpreting a SIP, we begin with a look toward the plain meaning of the plan and stop there if the language is clear.'" (quoting *Safe Air for Everyone v. EPA*, 488 F.3d 1088, 1095 (9th Cir. 2007))); *El Comite Para El Bienestar De Earlimart v. Warmerdam*, 539 F.3d 1062, 1070 (9th Cir. 2008) (rejecting an argument that the preamble to a SIP could trump the plain meaning of the text of the final regulation approved by EPA); *Washington Envtl. Council v. Sturdevant*, 834 F. Supp. 2d 1209, 1213 (W.D. Wash. 2011) ("In interpreting a SIP, the Court relies on the plain meaning of the plan and stops there if the language is clear.")

The language of the SIP could not be clearer:  "Total material moved (ore and waste) shall not exceed 150,500,000 tons per 12-month period ***without prior approval in accordance with Section 3.1, UACR***."   Undisputed Facts, ¶ 1 (emphasis added).  The language allowing KUC to exceed 150,500,000 tons per year, via the AO process, is expressly part of the material moved limit, and cannot be separated from it, or read out of the limit.  It is part and parcel of the limit itself, notwithstanding Plaintiffs' efforts to gloss over it.  *See Time Warner Entm't Co. v. Everest Midwest Lincesee, L.L.C.*, 381 F.3d 1039, 1053 (10th Cir. 2004) (holding that courts "must read the regulations such that every word is operative"); *see also Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 668-69 (2007) (stating that a court cannot interpret portions of a regulation as "mere surplusage").  As is apparent from the full text of the

material moved limit, KUC is operating in full compliance with the SIP so long as it stays under 150,500,000 tons per year, *or* gets "prior approval" to exceed that amount through the AO process under Section 3.1, UACR.

KUC indisputably obtained the necessary "prior approval[s]" in 1999 and 2011 to exceed 150,500,000 tons per year, and has indisputably stayed under the authorized limits of the 1999 and 2011 AOs.  Undisputed Facts, ¶¶ 2-4.  As such, KUC is in full compliance with the express, unambiguous language of the SIP.  Plaintiffs have not established a viable claim under section 304(a) against KUC.  Plaintiffs' claim can and should be dismissed based upon this very simple and obvious analysis.

### B.      Jurisdiction Is Lacking Over Plaintiffs' Claim That the SIP Violates the Clean Air Act.

In paragraph 69 of the First Amended Complaint, Plaintiffs concede the SIP allows the State of Utah to increase the annual material moved tonnage, but Plaintiffs argue that such discretion violates federal law.  Plaintiffs state, "[t]o the extent that the Utah SIP allows the State of Utah to issue approval orders in accordance with UACR R307-3.1 . . . *regardless of the language of the SIP, under federal law*, the State may not unilaterally change emission limits and other provisions of the SIP."  FAC, ¶ 69 (emphasis added).

To the extent Plaintiffs argue the SIP's grant of authority to Utah violates federal law, the Court cannot assert jurisdiction over such a claim.  As noted by the Tenth Circuit, citizens cannot pursue a "cleverly packaged citizen suit" under section 304(a) that attempts to re-write or veto a SIP, because section 307(b) vests jurisdiction over such claims in the courts of appeals.  *United Steelworkers*, 322 F.3d at 1225.  Any claim that the second prong of the material moved limit (allowing Utah to issue an AO through Section 3.1, UACR) violates the CAA would be a SIP

challenge, and that could only be filed within 60 days of the SIP approval (July 8, 1994), and only in the Tenth Circuit under section 307(b)(1).  The time to attack the SIP language has long since passed.

Moreover, the entire premise of Plaintiffs' case, that it would necessarily violate the CAA for the State of Utah to have discretion to adjust operational limits, has been rejected as without support in the actual language of the CAA.  *Texas v. EPA*, 690 F.3d 670, 682 (5th Cir. 2012). Underlying the analysis in *Texas v. EPA* was EPA's decision to disapprove a SIP provision because, in the eyes of EPA, the SIP conferred "too much discretion" upon Texas.  *Id.* at 681. The precise regulation at issue in *Texas* was the state's Flexible Permit Program, which allowed Texas to set a presumptive emission cap for sources that allowed facilities to make modifications without additional regulatory review so long as the modifications did not cause emissions to exceed the presumptive cap.  *Id.* at 676.  Significantly, EPA argued that because the SIP vested Texas with "director discretion," the SIP was contrary to the CAA.  *Id*. at 682.

But the Fifth Circuit found that nothing in the language of the CAA supported EPA's opposition to the discretion in Texas' SIP proposal.

> [T]he EPA has invoked the term "director discretion" as if that term were an independent and authoritative standard . . . .  There is, in fact, no independent and authoritative standard in the CAA or its implementing regulations requiring that a state director's discretion be cabined in the way that the EPA suggests.  Therefore, the EPA's insistence on some undefined limit on a director's discretion is, like the Agency's insistence on a particular drafting style, based on a standard that the CAA does not empower the EPA to enforce.

*Id*.  The Fifth Circuit reached a similar conclusion in *Luminant Generation Co. v. EPA*, 675 F.3d 917, 929-32 (5th Cir. 2012), holding that EPA could not reject Texas' proposed minor NSR permit SIP provisions, where EPA claimed those provisions granted too much discretion to

19

Texas and failed EPA's "similar source" and "replicability" tests, because the court found no support in the text of the CAA for EPA's position.

In sum, even if the Court had jurisdiction, which it does not, to address the legality of the SIP under the CAA, the SIP is legal.  Accordingly, Plaintiffs' claim must be dismissed.

III.   **PLAINTIFFS' ATTEMPT TO AVOID THE PLAIN LANGUAGE OF THE SIP IS UNAVAILING.**

Plaintiffs' primary argument in response to the plain language of the SIP boils down to an argument that has been rejected in CAA jurisprudence.  Notwithstanding the clear language authorizing the State of Utah to issue an AO allowing KUC to exceed 150,500,000 tons of material moved per year, Plaintiffs argue there was a SIP "revision" and that such "revision" has never been approved by EPA under section 110(i) of the CAA.  FAC, ¶¶ 29-30, 67-68.  The fundamental problem with Plaintiffs' argument is that there has been no SIP revision.  The language of the SIP does not need to be revised in any way in order for KUC to remain in compliance with the material moved limit.  There has been *implementation* of the SIP by the State of Utah for many years, clearly, but no revisions have been made to the SIP as it relates to the material moved limit.  Indeed, the language of the material moved limitation remains the same today as it did when EPA approved Utah's $PM_{10}$ SIP in 1994.  As the courts correctly point out, the State of Utah and sources like KUC must be able to rely upon the express, unambiguous language of a SIP.

Next, Plaintiffs try to avoid the plain language of the SIP by pointing to inapplicable statements EPA made in the 1994 $PM_{10}$ SIP approval preamble.  FAC, ¶ 70.  Even if such statements were applicable, EPA has since disavowed those statements, recognizing it is bound

by the language of the SIP as written, including the grant of authority to the State of Utah to implement the SIP.

      **A.**     **The Courts Recognize That When a SIP Grants a State Authority To Make Adjustments, Exercising That Authority Is Not a SIP Revision, But Rather Implementation.**

The SIP "revision" argument Plaintiffs advance in this case has been soundly rejected.  In two key SIP cases, *United States v. Ford Motor Co.*, 736 F. Supp. 1539 (W.D. Mo. 1990) and *United States v. General Motors Corp.*, 702 F. Supp. 133 (N.D. Tex. 1988), EPA tried to get around similar grants of authority it had approved in SIPs, by bringing enforcement actions premised on the theory that the exercise of that authority amounted to SIP revisions that had to be submitted to EPA for approval under CAA section 110(i).  In both cases, the district courts easily rejected EPA's "revision" argument, just as this Court should reject Plaintiffs' "revision" argument in this case.

Both *Ford* and *General Motors* involved alleged violations of SIP provisions that limited emissions of volatile organic compounds ("VOC") during automobile painting operations.  *Ford*, 736 F. Supp. at 1540-41; *General Motors*, 702 F. Supp. at 134-35.  In addition to the specific numeric emission limitations expressed in both the Texas SIP (applicable to *General Motors*) and the Missouri SIP (applicable to *Ford*), both SIPs also permitted state regulators to approve alternative emission standards that would replace the emission limitations set forth in the EPA-approved SIP.  *Ford*, 736 F. Supp. at 1545; *General Motors*, 702 F. Supp. at 135.  For instance, the provision of the Texas SIP, at issue in *General Motors*, read:

> Any person affected by any control requirements of Chapter 115 of this title [relating to Volatile Organic Compounds] may request the Executive Director to approve alternate methods of control.  The Executive Director shall approve such alternate methods of control

> if it can be demonstrated that such control will be substantially equivalent to the methods of control specified in this regulation.

*General Motors*, 702 F. Supp. at 136.

The district court in *General Motors* highlighted the fact that the SIP provision allowing the state to approve an alternative control method did not require any consent or approval by EPA. *Id.* at 135 (stating that, "[a]lthough EPA now takes the position that each AMOC must be federally approved as a SIP revision, the unambiguous provisions of the Texas SIP set forth no such requirement"). Despite the plain language of the SIP that required no submission to EPA, EPA "argue[d] that the AMOC[11] issued to GM [was] actually a revision of the Texas SIP and such revision can only be implemented with EPA approval." *Id.* at 136 (noting that EPA, as Plaintiffs do here, cited to CAA section 110(i), 42 U.S.C. § 7410(i)). According to the district court, EPA's argument could not have been more specious.

> In essence, the EPA argues that section 115.401(a), which it expressly approved, does not mean what it says. In support of this specious proposition, the EPA proffers what can only be described, charitably, as a "metaphysical" statutory interpretation. When confronted with the express language of section 115.401(a), which expressly permits an alternative method of control to achieve substantially equivalent compliance with national ambient air standards, the EPA blandly notes that such provision is too "generic" and "too opaque" to undermine the EPA's all "too important" review function under the Clean Air Act. The EPA's argument is simply too tenuous to surmount the plain language of section 115.401(a).

*Id.* at 137.

---

[11] Under the Texas SIP, the authority to adopt an alternative control plan was formally titled an "alternative method of control" or AMOC. *Id.*

Moreover, the fact that in retrospect EPA did not like the authority that it vested in Texas when it approved the Texas SIP, did not mean that EPA could re-write the SIP through an enforcement action.

> Simply because the EPA now believes it has made a mistake in failing to reserve the right to approve AMOCs, GM should not be subjected to substantial civil penalties . . . when the pleadings before this Court ***do not contain a single allegation that GM has violated the AMOC issued to it.   GM, quite rightly, relied on the TACB's issuance of the AMOC***:  the Texas SIP expressly allowed the TACB's Executive Director to approve alternate emission control methods.   The EPA approved the Texas SIP and, in particular, section 115.401(a), which authorized the TACB to grant GM the AMOC in issue here.   ***The EPA is bound by its approval*** of section 115.401(a).

*Id.* (emphasis added).

As to EPA's argument that there had actually been a SIP revision, the district court found that there had only been implementation, no revision.

> Eight years after delegating AMOC authority to the State of Texas, this delegation cannot now, inexplicably, be transformed into a SIP "revision" which requires EPA approval.   The EPA's argument, in this regard, is sadly misguided . . . .   An AMOC issued under the VOC portion of the Texas SIP *is* an implementation of the SIP, *not a modification*.

*Id.* (emphasis in original).  This logic holds true in this case:  an AO issued by Utah under the material moved limit of Utah's SIP is an implementation of the SIP, not a modification.

The same argument advanced by the EPA to the district court presiding over the *Ford* litigation ended with the same result.  In the *Ford* case, the district court began its holding by recounting the procedures that set the relevant emission standards:  the SIP language allowing for an alternative compliance plan (or "ACP" in the language of the Missouri SIP), EPA's approval of the SIP, and Missouri's approval of Ford's alternative limits pursuant to the Missouri SIP.

*Ford*, 736 F. Supp. at 1547.  Once again, EPA's argument that it must approve the alternative

emission limitations went nowhere with the district court.

> [T]he EPA contends that it has final approval authority over ACPs
> approved by [Missouri] and that it did not approve this ACP.  This
> argument, however, ignores the plain language of section (2)(C).
> Section (2)(C) could not be clearer.  Approval or disapproval of an
> ACP rests solely with [Missouri]. There is no provision for EPA
> approval of Missouri ACPs.

*Id.*

In sum, once EPA approves a SIP, and includes an emission limitation that delegates

express implementation authority to a state, the plain language of the SIP controls, and can be

relied upon as written.  *General Motors*, 702 F. Supp. at 137 (stating that if "EPA believes that

the discretionary authority vested" in Texas undermines the state's ability to attain or maintain

the NAAQS, EPA "may seek a revision of the SIP").

Applying slightly different logic than the *General Motors* and *Ford* cases, the United

States District Court for the Eastern District of Tennessee reached the same result in *Nat'l Parks

Conservation Ass'n, Inc. v. Tenn. Valley Auth.*, 175 F. Supp. 2d 1071 (E.D. Tenn. 2001).  The

SIP at issue in the *National Parks* case set an opacity (visible smoke) limit of 20 percent, but

authorized Tennessee to grant an alternative limit in a source's permit, which Tennessee had

granted to the defendant in that case.  *Id.* at 1074-75.  Plaintiff argued the alternative opacity

limit had no effect because it had not been approved by EPA, whereas the defendant took the

position that under the language of the SIP, there was no requirement to obtain EPA approval for

the alternative limit.  *Id.* at 1075.

The district court rejected plaintiff's claim as being an impermissible "collateral attack on

a facially valid permit issued by the state enforcement agency."  *Id.* at 1078.  The court relied

upon two earlier cases, *United States v. Solar Turbines, Inc.*, 732 F. Supp. 535 (M.D. Pa. 1989) and *United States v. AM Gen. Corp.*, 34 F.3d 472 (7th Cir. 1994), which rejected EPA enforcement actions on the grounds that a source cannot be held liable for simply following a facially valid permit.  175 F. Supp. 2d at 1078-79.  After discussing these cases, the court stated:

> Similarly, I find no evidence in the language of the Clean Air Act to indicate that Congress intended that citizen suits could be used to collaterally attack facially valid state permits.  42 U.S.C. § 7604(a) provides the provision under which citizen suits may be brought.  Relevant to this lawsuit, subsection (a)(1) allows a citizen suit against a person in violation of "an emission standard or limitation under this chapter" or "an order issued by the Administrator or a State with respect to such a standard or limitation."  Thus, although a citizen suit may be brought against a polluter violating a standard or limitation set by the EPA or by a state, there is no citizen suit provision allowing a citizen plaintiff to challenge an emission standard or limitation, and that is what plaintiff here seeks to do.  Quite simply, plaintiff's dispute is with the State of Tennessee through TDEC for issuing these permits.

*Id.* at 1079.  The district court's observation, that the plaintiff's real dispute was with Tennessee, is equally true here.  Plaintiffs should not be allowed to collaterally attack the facially valid AOs issued to KUC by the State of Utah, including an AO issued as far back as 1999, and their case must be dismissed.[12]

---

[12] In *Texas v. EPA*, the Fifth Circuit noted the inequity of EPA's attempt, "[s]ixteen years tardy," to disapprove the SIP permitting provision at issue, after numerous sources had relied upon the provision, thereby exposing those sources to after-the-fact enforcement.   690 F.3d at 673, 676 (5th Cir. 2012).  Similar inequities exist here.  KUC has relied on the express language of the SIP, doing so first in 1999, and then again in 2011, with no challenges being filed against KUC's compliance with the SIP during that lengthy timeframe.

25

**B.      EPA's 1994 Preamble Statement Is Inapplicable and Cannot Alter the Plain Language of the SIP.**

Plaintiffs also attempt to get around the plain language of the material moved limit by relying upon statements EPA made in the preamble approving the SIP in 1994.  Specifically, Plaintiffs argue:

> Furthermore, where a Utah-issued approval order conflicts with a SIP and specifically in the context of the 1994 SIP approval, EPA has made it clear that, "should different emission limitations exist . . . the more stringent of the two (or more) emission limitations [will be enforced]."  59 Fed. Reg. 35036, 35042 (July 8, 1994).

FAC, ¶ 70.

The first problem with Plaintiffs' reliance upon this language is that it is improper to jump to the preamble language, because the language of the SIP is clear and unambiguous.  *See supra* Argument, Part II. A.  There is nothing in the material moved limit, or elsewhere in the SIP, that requires EPA to approve an AO issued to KUC under the material moved limit.

In *NRDC v. SCAQMD*, faced with a similar effort to use preamble language to add requirements to a SIP, the Ninth Circuit rejected the effort because the SIP was unambiguous. The court explained that preamble language is the non-operative language in the Federal Register that precedes the actual rulemaking that amends the Code of Federal Regulations.  651 F.3d at 1073.  Relying upon preamble language, the citizens in that case argued the defendant had been violating a supposed requirement to track emissions reductions.

> The EPA rule approving the SIP does contain a reference to a tracking system in its preamble.  Approval of Implementation Plan, 61 Fed. Reg. at 64292.  Yet we are not to consider such references unless the regulation itself is ambiguous.  *El Comite*, 539. F.3d at 1070.  There is no ambiguity here.  Nothing in the EPA-approved SIP even suggests a tracking system must be applied.  The district

> court thus properly dismissed the NRDC's third and fourth claims
> for failure to allege a violation of the EPA rule or the SIP.

*Id*.  Similarly, in *El Comite*, the Ninth Circuit reversed a district court decision that relied upon preamble language to impose obligations, where those obligations were not actually incorporated into the text of the SIP itself.  539 F.3d at 1070 ("Regarding the first source [relied upon by the district court], the preamble language should not be considered unless the regulation itself is ambiguous.").

In *United States v. Cinergy Corp*., 623 F.3d 455, 458 (7th Cir. 2010), the Seventh Circuit rejected EPA's argument that statements made by EPA could trump the express language of a SIP.  Indiana's SIP at issue in *Cinergy Corp.* contained a provision that exempted sources from obtaining permits if, although a modification to the source increased annual emissions, the modification did not increase hourly emissions.   623 F.3d at 457-58.  EPA had stated, in a guidance document that pre-dated the SIP approval, that such provisions conflicted with the CAA.  *Id*. at 458.  Also, EPA pointed out that Indiana had agreed, one year after the SIP had been approved, that it would remove the rule at issue.  *Id.*  Indiana in fact removed the rule from its state regulations, but did not submit the revised rule to EPA until twelve years later, at which time EPA approved it.  *Id.* at 457.  In the meantime, after Indiana had removed the rule but before EPA had approved such removal, the defendant made a plant modification that it argued was exempted from permitting under the original, EPA-approved SIP.  *Id.* at 457-58.  The district court ruled in favor of EPA, but the Seventh Circuit reversed and ruled defendant had complied with the SIP as expressly written:  "The district court bought this argument [that the defendant was on notice it could not rely on the actual language of the SIP].  But it's untenable.

The Clean Air Act does not authorize the imposition of sanctions for conduct that complies with a [SIP] that the EPA has approved." *Id.* at 458.

The second problem with Plaintiffs' reliance upon the preamble language is that the language Plaintiffs cite does not even purport to address KUC's material moved limit at all, so it cannot be said to give meaning to that particular provision in the SIP.  EPA's statement is more in the nature of a general observation, which appears to be tied to some adjustment of limits still occurring at the state level, after the SIP had been submitted to EPA for formal approval. *See* 59 Fed. Reg. at 35042/1 ("Since State adoption of this $PM_{10}$ SIP, the State has been finalizing the permit conditions for stationary sources.").

The final reason EPA's 1994 preamble language cannot trump the plain language of the SIP, is that EPA subsequently conceded it is bound by the language of the SIP as written, including any so called "director's discretion" provisions that grant Utah latitude to adjust emissions limits.  EPA made this admission in a 2001 SIP rulemaking, when responding to a public comment expressing concern about AOs issued by the State of Utah supposedly conflicting with old SIP limits.

> We have had ongoing discussions with the State regarding these "director's discretion" provisions in the context of the State's future development of redesignation requests and maintenance plans for the two counties, and have informed the State that we believe this ***apparent discretion to unilaterally change SIP terms*** is inconsistent with the SIP oversight role provided EPA under the Act, and would need to be removed if maintenance plan submissions for these areas are to be found approvable . . . . However, given the language referenced above [citing another provision in Utah's SIP granting discretion to the State], that is contained in ***the currently-applicable SIP authorizing such changes***, we don't believe that insisting on this traditional view in response to past actions is appropriate.   We believe ***SIP***

> ***implementation must be evaluated against the SIP as written***,
> even though we may not agree with all SIP terms.

66 Fed. Reg. 32752, 32759/2 (June 18, 2001) (emphasis added).  EPA's candid admission, which

is in direct accord with the applicable case law, underscores why Plaintiffs' case must be

dismissed:  KUC is in full compliance with the express terms of the material moved limit, as it is

written in the EPA-approved SIP.

<u>**CONCLUSION**</u>

Because it is undisputed that KUC is in compliance with the SIP, this case should be

dismissed on summary judgment.  KUC has done everything required of it under the SIP.

Through a public process open to administrative challenge, KUC obtained the necessary AOs

allowing it to legally increase the amount of ore and waste rock moved at the BCM.  No party

ever challenged the legality of the AOs, and they became final orders.  KUC has complied with

the AOs at all times.  KUC cannot be found at fault in any way, as it pursued the express legal

pathway provided to it under the SIP and has justifiably relied upon the AOs granted to it by the

State of Utah.

DATED this 25th day of January, 2013.


/s/ Michael A. Zody
Michael L. Larsen
Michael A. Zody
PARSONS BEHLE & LATIMER

*Attorneys for Defendant Kennecott Utah Copper LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 25th day of January, 2013, a true and correct copy of the

foregoing **KENNECOTT UTAH COPPER LLC'S MOTION FOR SUMMARY**

**JUDGMENT AND SUPPORTING MEMORANDUM** was filed electronically with the Clerk

of Court using the CM/ECF system which will send notification of such filing to the following:

> Joro Walker
> Western Resource Advocates
> 150 South 600 East, Suite 2A
> Salt Lake City, UT  84102
> jwalker@westernresources.org
>
> Samantha Ruscavage-Barz
> WildEarth Guardians
> 516 Alto Street
> Santa Fe, NM  87501
> sruscavagebarz@wildearthguardians.org

/s/ Michael A. Zody