Joro Walker, USB# 6676
Charles R. Dubuc, Jr., USB # 12079
150 South 600 East, Ste. 2A
Salt Lake City, Utah  84102
Tel. 801.487.9911
jwalker@westernresources.org
rdubuc@westernresources.org

*Attorneys for Utah Physicians for a Healthy Environment
and Utah Moms for Clean Air*

Samantha Ruscavage-Barz
NM Bar. No. 23276
WildEarth Guardians
516 Alto Street
Santa Fe, New Mexico  87501
Tel. 505-988-9126 x1158/Fax 505-213-1895
sruscavagebarz@wildearthguardians.org

*Attorney for WildEarth Guardians and the Sierra Club*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

_____
                                                          )
UTAH PHYSICIANS FOR A HEALTHY        )
ENVIRONMENT,                                        )
WILDEARTH GUARDIANS,                       )     Civil Case No. 2:11-cv-011811-DN
UTAH MOMS FOR CLEAN AIR, and        )     Honorable Judge Robert J. Shelby
SIERRA CLUB,                                         )
                                                          )
             Plaintiffs,                                  )
                                                          )     **PLAINTIFFS' MOTION**
v.                                                            )     **FOR SUMMARY JUDGMENT**
                                                          )
KENNECOTT UTAH COPPER, LLC          )
                                                          )
             Defendant.                                 )
                                                          )
_____ )

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and DUCivR 56-1(a), Plaintiffs Utah Physicians for a Healthy Environment, WildEarth Guardians, Utah Moms for Clean Air, and the Sierra Club (collectively, "Citizen Groups") hereby move for summary judgment on the issue of whether Defendant Kennecott Utah Copper, LLC, violated the Utah State Implementation Plan and the Clean Air Act when the Bingham Canyon Copper Mine exceeded the 150,500,000 limit on annual tons of material moved at the mine.  In support of this motion, the Citizen Groups are concurrently filing a Memorandum of Points and Authorities.

For the reasons provided in the supporting Memorandum, the Citizen Groups respectfully request that this Court grant their Motion for Summary Judgment and declare that Defendant Kennecott Utah Copper is in violation of the Utah SIP for failing to comply with the 150,500,000 ton limit on total material moved and consequently is also in violation of the Clean Air Act, 42 U.S.C. § 7604(a)(1)(A).

Respectfully submitted on this 25th day of January 2013.

/s/ Samantha Ruscavage-Barz
Samantha Ruscavage-Barz
NM Bar. No. 23276
WildEarth Guardians
516 Alto Street
Santa Fe, New Mexico  87501
Tel. 505-988-9126 x1158/Fax 505-213-1895
sruscavagebarz@wildearthguardians.org

*Attorney for WildEarth Guardians and the Sierra Club*

/s/ Joro Walker
Joro Walker, USB# 6676
Charles R. Dubuc, Jr., USB # 12079
150 South 600 East, Ste. 2A
Salt Lake City, Utah  84102
Tel. 801.487.9911
jwalker@westernresources.org
rdubuc@westernresources.org

*Attorneys for Utah Physicians for a Healthy
Environment and Utah Moms for Clean Air*

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of January, 2013, a true and correct copy of the foregoing **PLAINTIFFS MOTION FOR SUMMARY JUDGMENT** was filed electronically with the Clerk of Court using the CM/ECF system which will send notification of such filing to all attorneys of record.

/s/ Samantha Ruscavage-Barz

Joro Walker, USB# 6676
Charles R. Dubuc, Jr., USB # 12079
150 South 600 East, Ste. 2A
Salt Lake City, Utah  84102
Tel. 801.487.9911
jwalker@westernresources.org
rdubuc@westernresources.org

*Attorneys for Utah Physicians for a Healthy Environment
and Utah Moms for Clean Air*

Samantha Ruscavage-Barz
NM Bar. No. 23276
WildEarth Guardians
516 Alto Street
Santa Fe, New Mexico  87501
Tel. 505-988-9126 x1158/Fax 505-213-1895
sruscavagebarz@wildearthguardians.org

*Attorney for WildEarth Guardians and the Sierra Club*

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| _____ ) | |
| UTAH PHYSICIANS FOR A HEALTHY ) | |
| ENVIRONMENT, ) | |
| WILDEARTH GUARDIANS, ) | Civil Case No. 2:11-cv-011811-DN |
| UTAH MOMS FOR CLEAN AIR, and ) | Honorable Judge Robert J. Shelby |
| SIERRA CLUB, ) | |
| ) | |
|      Plaintiffs, ) | |
| ) | **PLAINTIFFS' MEMORANDUM** |
| v. ) | **IN SUPPORT OF MOTION FOR** |
| ) | **SUMMARY JUDGMENT** |
| ) | |
| KENNECOTT UTAH COPPER, LLC ) | |
| ) | |
|      Defendant. ) | |
| ) | |
| _____ ) | |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................iv

INTRODUCTION....................................................................................................1

LEGAL BACKGROUND........................................................................................3

PROCEDURAL BACKGROUND...........................................................................5

STATEMENT OF UNDISPUTED MATERIAL FACTS........................................5

I.      PARTICULATE MATTER AIR POLLUTION...........................................5
II.     PM POLLUTION AND SALT LAKE COUNTY.......................................6
III.    THE ADVERSE HEALTH EFFECTS OF PM..........................................8
IV.     THE BINGHAM MINE...............................................................................9

STANDARD OF REVIEW....................................................................................12

ARGUMENT.........................................................................................................13

I.      THE 150.5 MILLION TONS-PER-YEAR PRODUCTION LIMIT IN THE 1994 SALT LAKE COUNTY $PM_{10}$ SIP APPLIES TO THE BINGHAM CANYON MINE AND CAN ONLY BE INCREASED THROUGH THE SIP AMENDMENT PROCESS OUTLINED IN THE CLEAN AIR ACT............................................................15

        A.      The 150.5 Million Ton Annual Production Limit for the Bingham Mine is a Federal Regulation...............................................................................15

        B.      Because Bingham Mine's Production Limit is Part of the Utah SIP, This Limit Can Only be Changed by Amending the Utah SIP.......................16

II.     THE 1999 AND 2011 APPROVAL ORDERS ISSUED BY THE STATE CANNOT EXCUSE KENNECOTT FROM COMPLYING WITH THE PRODUCTION LIMIT PRESCRIBED BY THE 1994 SALT LAKE COUNTY $PM_{10}$ SIP BECAUSE EPA HAS NOT APPROVED A SIP AMENDMENT ALLOWING A PRODUCTION LIMIT IN EXCESS OF 150.5 MILLION TONS-PER-YEAR........................................18

        A.      According to the Plain Language of the Clean Air Act and Case Law Interpreting that Language, Bingham Mine's Production Limit Cannot be Changed by Unilateral State Action..................................................19

        B.      EPA's Statements and Utah's Inclusion of the Increased Material Moved Limit in Its SIP Submissions Seeking EPA Approval Indicate that Approval Orders May Not Excuse Kennecott from Complying with the Production Cap in the Utah SIP...................................................................................22

C.    Utah's Inclusion of the Increased Production Cap in Its SIP Submissions
      Seeking EPA Approval Also Indicates that Approval Orders May Not
      Excuse Kennecott from Complying with the Production Cap in the Utah
      SIP..................................................................................................................25

D.    Utah's Own Air Conservation Regulations Support the Only Proper
      Interpretation of the PM$_{10}$ SIP—that the SIP Emission Limits Remain
      Enforceable Unless and Until EPA Approves any SIP Revision that Changes
      the Limits. ......................................................................................................26

CONCLUSION..............................................................................................................28

## TABLE OF AUTHORITIES

**Cases**

Abramowitz v. EPA,
    832 F.2d 1071 (9th Cir. 1987)........................................................................16

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242 (1986)..................................................................................12

Beecham v. United States,
    511 U.S. 368 (1994)..................................................................................20

Bridger Coal Co./Pacific Minerals, Inc. v. Director, Office of Workers
Compensation Programs,
    927 F.2d 1150 (10th Cir. 1991)......................................................................20

Engine Manufacturers Ass'n v. E.P.A.,
    88 F.3d 1075 (D.C. Cir. 1996).......................................................................20

Environmental Defense v. EPA,
    467 F.3d 1329 (D.C. Cir. 2006).....................................................................16

General Motors Corp. v. United States,
    496 U.S. 530 (1990)...............................................................................5, 16

Hunt v. Washington State Apple Advertising Commission,
    432 U.S. 333 (1977)..................................................................................13

John Hancock Mut. Life Ins. Co. v. Harris Trust & Savings Bank,
    510 U.S. 86 (1993)...................................................................................20

Lujan v. Defenders of Wildlife,
    504 U.S. 555 (1992)..................................................................................13

Pa. Dept. of Public Welfare v. Davenport,
    495 U.S. 552 (1990)..................................................................................20

Sierra Club v. Tennessee Valley Authority,
    430 F.3d 1337 (11th Cir. 2005).................................................................16, 21

Somoza v. Univ. of Denver,
    513 F.3d 1206 (10th Cir. 2008).....................................................................12

U.S. v. Coffman,
    638 F.2d 192 (10th Cir.1989)..................................................................................6

U.S. v. Ford Motor Company,
    814 F.2d 1099 (6th Cir. 1987)..........................................................................16, 25

U.S. v. Mead,
    533 U.S. 218 (2001)...........................................................................................25

United States v. Menasche,
    348 U.S. 528 (1955)...........................................................................................20

## Federal Statutes and Regulations

5 U.S.C. § 553(e)....................................................................................................4
42 U.S.C. § 7401(b)(2)............................................................................................3
42 U.S.C. § 7409(a)................................................................................................3
42 U.S.C. § 7409(b)................................................................................................3
42 U.S.C. § 7409(b)(1)............................................................................................5
42 U.S.C. § 7409(b)(2)............................................................................................5
42 U.S.C. § 7410....................................................................................................19
42 U.S.C. § 7410(a)................................................................................................3
42 U.S.C. § 7410(a)(1)............................................................................................3
42 U.S.C. § 7410(a)(2)(A).......................................................................................3
42 U.S.C. § 7410(i)......................................................................................4, 16, 19
42 U.S.C. § 7410(k)(3)............................................................................................4
42 U.S.C. § 7413..................................................................................................15
42 U.S.C. § 7416..................................................................................................20
42 U.S.C. § 7602(k)..............................................................................................19
42 U.S.C. § 7602(q)........................................................................................16, 19
42 U.S.C. § 7604..................................................................................................15
42 U.S.C. § 7604(a)(1)(A).......................................................................................28
42 U.S.C. § 7607(b)(1)............................................................................................4
42 U.S.C. §§ 7607(d)(1)-(6).....................................................................................4
42 U.S.C. § 7607(h)................................................................................................4
44 U.S.C. § 1507....................................................................................................6

40 C.F.R. § 50.1, et seq..........................................................................................5
40 C.F.R § 50.2....................................................................................................6
40 C.F.R § 51.104................................................................................................20
40 C.F.R. § 51.105..........................................................................................16, 20
40 C.F.R. § 52.2320 et seq.................................................................................4, 14
40 C.F.R. § 52.2320(c)(25)(i)(a)..............................................................................15
40 C.F.R. § 52.2320(c)(25)(i)(c)...........................................................................9, 15
40 C.F.R. § 81.345................................................................................................7

**Other Authority**

52 Fed. Reg. 24,634 (July 1, 1987)...................................................................................6

59 Fed. Reg. 35,036 (July 8, 1994)...............................................................6, 7, 9, 10, 15, 22

62 Fed. Reg. 38,652 (July 18, 1997)................................................................................6

66 Fed. Reg. 32,752 (June 18, 2001)..............................................................................7

67 Fed. Reg. 78,181 (Dec. 23, 2002)........................................................................23, 24

74 Fed. Reg. 62,717 (Dec. 1, 2009)........................................................................4, 7, 17, 24

DUCivR 56-1...........................................................................................................11

EPA, $PM_{10}$ Design Value Data...................................................................................7

Fed. R. Civ. P. 56(c)(2)...........................................................................................12

Fed. R. Evid. 201.....................................................................................................6

H.R.Rep. No. 1146, 91st Cong., 2d Sess. 1,1, 1970 U.S. Code Cong. & Admin. News 5356.........3

Utah Air Conservation Regulations...............................................................10, 11, 15, 18, 26, 27

Utah SIP, Control Strategies, Fine Particulate Matter ($PM_{10}$), Section IX.A.1.......................6, 10

Utah State Implementation Plan, Section IX.A, Section 2.2W(2)...................................................9

Utah State Implementation Plan, Section IX, Part A – Fine Particulate Matter ($PM_{10}$),
      Appendix A...................................................................................................15

**INTRODUCTION**

Plaintiffs Utah Physicians for a Healthy Environment, WildEarth Guardians, Utah Moms for Clean Air, and the Sierra Club (collectively, "Citizen Groups") brings this suit to address Defendant Kennecott Utah Copper's ("Kennecott") past and ongoing violations of the Clean Air Act ("CAA") and the Utah State Implementation Plan ("SIP") by the operation of its Bingham Canyon copper mine ("Bingham Mine") in the foothills of the Oquirrh Mountains of western Salt Lake County, Utah.  Activities at the Bingham Mine produce high levels of particulate matter ("PM"), an air pollutant that includes dust, soot, smoke, acidic gases, and heavy metals.  This toxic dust poses a major health threat to citizens living along the Wasatch Front because it damages their respiratory and cardiovascular systems and can cause heart attack and premature death.

Recognizing the severity of health effects from breathing high levels of PM, the U.S. Environmental Protection Agency ("EPA") established health-based National Ambient Air Quality Standards ("NAAQS") for $PM_{10}$, visible to the naked eye as dust or smoke, and $PM_{2.5}$, invisible soot and dust particles that can adhere to the lungs and enter the bloodstream.  Under the Clean Air Act, states bear the responsibility of enforcing and maintaining the $PM_{10}$ and $PM_{2.5}$ NAAQS through state implementation plans.  To combat dangerous levels of $PM_{10}$ pollution in Salt Lake County, Utah developed the SIP designed to ensure compliance with the NAAQS for $PM_{10}$ in Salt Lake County.  In 1994, EPA approved the SIP and as a result, the SIP is federal law and federally enforceable.

Among the various provisions necessary to ensure compliance with the health-based NAAQS, the 1994 SIP limited $PM_{10}$ emissions associated with operations at the Bingham Mine by limiting the total material, including ore and waste, that Kennecott could move at the mine

site to no more than 150,500,000 tons per 12-month period.  The reason for this production cap was to ensure that mining activities—including material hauling, dumping, digging, blasting, and machinery use—did not emit $PM_{10}$ pollution that would cause or contribute to violations of the NAAQS.  In other words, the Bingham Mine production cap was one of the explicit measures on which Utah relied to establish or demonstrate to EPA and the public that air pollution in the Salt Lake Valley would be reduced to the point that citizens would no longer be exposed to unhealthy levels of $PM_{10}$ pollution.

For at least the last five years, however, Kennecott has regularly exceeded the Bingham Mine production cap contained in Utah's federally-enforceable $PM_{10}$ SIP.  The amount of material moved at the Bingham Mine has been as high as 192,684,252 tons of ore and waste rock over a 12-month period.  To this day, Kennecott continues to exceed the production cap at its Bingham Mine and has received approval from Utah—although not from EPA—to increase the amount of material moved to as much as 260,000,000 tons of ore and waste rock per year.

Although Kennecott claims that the State of Utah has approved the increased production cap for the Bingham Mine through the state permitting process, Kennecott's actions are not allowed under federal law.  Kennecott is bound by the federally enforceable production limit in the SIP, which was established in 1994 for the express purpose of improving air quality in Salt Lake County and remains bound by that limit unless and until EPA approves a SIP revision that relaxes that production cap.  Although Utah has submitted two proposed SIP revisions to EPA that included a state-approved increase in production, EPA has not approved either of those proposed SIP revisions and indeed, has published its intent to disapprove the first state plan.

## LEGAL BACKGROUND

Congress enacted the Clean Air Act to "speed up, expand, and intensify the war against air pollution in the United States with a view to assuring that the air we breathe throughout the Nation is wholesome once again."  H.R.Rep. No. 1146, 91st Cong., 2d Sess. 1,1, 1970 U.S. Code Cong. & Admin. News 5356, 5356.  The Clean Air Act's explicit goal is to, among other things, "protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of the population."  42 U.S.C. § 7401(b)(2).

Towards this end, the Clean Air Act employs a model of cooperative federalism.  It starts when EPA sets health, welfare and environmentally-based National Ambient Air Quality Standards ("NAAQS") for a criteria air pollutant in accordance with Section 109 of the Act.  See 42 U.S.C. § 7409(a).  EPA is required to establish NAAQS to ensure that pollution concentrations in the air that the public breathes are limited to the levels requisite to protect, with an adequate margin of safety, health, welfare and the environment.  See 42 U.S.C. § 7409(b).

Once EPA has established a NAAQS, individual states must develop state implementation plans to "provid[e] for implementation, maintenance, and enforcement" of the standards.  42 U.S.C. § 7410(a)(1).  These plans consists of "emission limitations and other control measures, means, or techniques...as well as schedules and timetables for compliance, as may be necessary or appropriate to meet the [Clean Air Act]."  42 U.S.C. § 7410(a)(2)(A).  Above all, a implementation plan must be "enforceable."  Id.  States submit these plans to EPA for approval in accordance with Section 110 of the Clean Air Act.  See 42 U.S.C. § 7410(a).  EPA reviews these submissions to ensure that the plan meets the minimum requirements of the Clean Air Act.  If the proposal meets these requirements, EPA approves the plan or any plan

revision.  See 42 U.S.C. § 7410(k)(3) (providing that EPA shall approve, disapprove, or partially approve or disapprove a state implementation plan).

Once approved, a state implementation plan may only be challenged through the filing of a Petition for Review with the appropriate United States Court of Appeals within 60 days of the EPA approval.  42 U.S.C. § 7607(b)(1) (setting forth jurisdiction and timing restriction for review of substantive EPA actions).

When fully approved, a state implementation plan is incorporated into the code of federal regulations and becomes enforceable under the Clean Air Act.  See e.g., 40 C.F.R. § 52.2320 et seq. (incorporating provisions of Utah SIP).  Such federally enforceable provisions may only be revised through the federal rulemaking process set forth by the Clean Air Act and the Administrative Procedure Act.  See 42 U.S.C. §§ 7607(d)(1)-(6) (setting forth rulemaking requirements for "such...actions as the [EPA] Administrator may determine"); 42 U.S.C. § 7607(h) (setting forth minimum 30-day public comment period for rules promulgated under the Clean Air Act); and 5 U.S.C. § 553(e) (setting forth general federal rulemaking procedures).

To this end, the Clean Air Act is explicit that, except through a state implementation plan revision or other limited circumstances not relevant to this case, "no...action modifying any requirement of an applicable implementation plan may be taken with respect to any stationary source by the State or the [EPA] Administrator."  42 U.S.C. § 7410(i).  In other words, a state implementation plan cannot be unilaterally modified by a state or EPA without undertaking appropriate federal rulemaking procedures.  As EPA has explained:

> EPA's approval of a SIP has several consequences.  For example, after EPA approves a SIP, EPA and citizens may enforce the SIP's requirements in Federal court under section 113 and section 304 of the Act; in other words, EPA's approval of a SIP makes the SIP "Federally enforceable."  Also, once EPA has approved a SIP, a state cannot unilaterally change the Federally enforceable version of the SIP.  Instead, the state must first submit a SIP revision to the EPA and gain EPA's approval of that revision.

74 Fed. Reg. 62717, 62718 (Dec. 1, 2009).  Until EPA approves a SIP revision, the approved SIP

is the applicable implementation plan with which regulated entities must comply to prevent a

violation of the Clean Air Act.  General Motors Corp. v. United States, 496 U.S. 530, 540

(1990).

## PROCEDURAL BACKGROUND

This case is divided into two litigation phases.  Phase 1 is focused exclusively on

liability.  If the Court grants the Citizen Groups' Motion for Summary Judgment, then the case

will proceed to Phase 2.  The second phase will focus on remedies, including injunctive relief

and/or penalties.  This phasing is detailed in the Schedule Order filed on July 16, 2012.  ECF

Doc. No. 32.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Civil Rule DUCivR 56-1, Citizen Groups hereby provide the following

statement of undisputed material facts.

## I.    PARTICULATE MATTER AIR POLLUTION

1.      Particulate matter is one of six "criteria" pollutants considered harmful to public

health and the environment for which EPA has established NAAQS under the Clean Air Act.

See 40 C.F.R. § 50.1, et seq. (setting forth NAAQS).  The Clean Air Act identifies two types of

national ambient air quality standards.  Primary standards provide public health protection,

including the health of sensitive populations such as children, the elderly and asthmatics.  42

U.S.C. § 7409(b)(1).  Secondary standards provide public welfare protection, including

protection against decreased visibility and damage to animals, crops, vegetation, and buildings.

Id. at § 7409(b)(2).

2.      Responding to repeated studies recognizing that smaller particles become embedded deeper in the human body—including the lung and the heart—and so represented a "markedly greater" risk to human health, EPA revised the NAAQS for particulate matter ("PM") in 1987 to apply only to particles equal to or smaller than 10 micrometers ("$PM_{10}$").  52 Fed. Reg. 24,634, 24,639 (July 1, 1987).[1]

3.      Not until 1997 did EPA again revised the particulate matter NAAQS, this time setting separate $PM_{2.5}$ standards for fine particles (having a diameter of 2.5 micrometers or less), while retaining the existing $PM_{10}$ standards.  62 Fed. Reg. 38,652, 38,654 nn.5-6 (July 18, 1997).

4.      In setting NAAQS for both $PM_{10}$ and $PM_{2.5}$, EPA has acknowledged that particles within both size ranges constitute a serious threat to human health at or above the concentrations established by the standards.  See 40 C.F.R. § 50.2.

## II.    PM POLLUTION AND SALT LAKE COUNTY

5.      In 1977, EPA designated Salt Lake County as nonattainment for total suspended particulates, a type of PM.  See Utah SIP, Control Strategies, Fine Particulate Matter ($PM_{10}$), Section IX.A.1; see also Compl. ¶ 50, Answer ¶ 50 (admission).  As a result of the Clean Air Act Amendments of 1990, Salt Lake County was subsequently classified by operation of law as a moderate $PM_{10}$ nonattainment area due to violations of the 24-hour NAAQS.  Compl. ¶ 50, Answer ¶ 50 (admission).

6.      Because Salt Lake County was not meeting the $PM_{10}$ NAAQS, Utah prepared and submitted a SIP to EPA to address the area's $PM_{10}$ pollution.  59 Fed. Reg. 35,036 (July 8, 1994). On July 8, 1994, EPA approved the SIP for Salt Lake County, Utah.  Id.; see also Compl. ¶ 51,

---

[1]  Adjudicative facts presented in the Federal Register are subject to judicial notice.  See FRE 201; 44 U.S.C. § 1507; United States v. Coffman, 638 F.2d 192, 194 (10th Cir.1989) (judicial notice should be taken of relevant contents of Federal Register).

Answer ¶ 51 (admission).  In so doing, EPA necessarily determined that Utah had adequately "demonstrated" that the combination of the specific measures set forth in the plan would improve air quality in Salt Lake County sufficiently to bring the area into compliance with the $PM_{10}$ NAAQS by December 31, 1994.  Id.

7.      EPA subsequently determined that Salt Lake County had attained the 24-hour $PM_{10}$ NAAQS as of December 31, 1995.  See 66 Fed. Reg. 32,752 (June 18, 2001).  However, beginning in 2001, Salt Lake County again began experiencing exceedances of the $PM_{10}$ NAAQS that resulted in violations at two monitoring sites, including one in Magna and one in North Salt Lake City.  74 Fed. Reg. 62,717, 62,720 (Dec. 1, 2009) (According to EPA, "[a]t least one Salt Lake County monitor has been in violation of the $PM_{10}$ NAAQS in every three-year period since 2001.").

8.      Based on the most recent data available from the State, EPA has determined that Salt Lake County is still violating the 24-hour $PM_{10}$ NAAQS every year.  See EPA, $PM_{10}$ Design Value Data.[2]

9.      As a result, Salt Lake County remains designated as nonattainment for the $PM_{10}$ NAAQS.  See 40 C.F.R. § 81.345.

10.     Since 2009, Salt Lake County has also been designated as non attainment for the 24-hour $PM_{2.5}$ NAAQS.  Salt Lake County continues to experience severe, short term spikes in $PM_{2.5}$ pollution.  For example, already in 2013, the area has suffered two extended periods of high concentrations of $PM_{2.5}$, during which 24-hour average levels of fine particulate matter were

---

[2]  Available at http://www.epa.gov/airtrends/pdfs/PM10_DesignValues_20082010_Final.xlsx (last accessed Dec. 19, 2011).

almost twice the health-based standard of 35 μg/m3, while one-hour concentrations rose to 90

μg/m3.[3]

      11.    Salt Lake City's repeated acute episodes of extremely poor air quality have led

the American Lung Association to label Salt Lake City as the seventh worst polluted cites for

short term episodes of particulate matter pollution in the United States.[4]

## III.    THE ADVERSE HEALTH EFFECTS OF PM

      12.    Numerous peer-reviewed medical studies show that there are no safe levels of PM

exposure.  Health Impacts Report at 3-5. (Exhibit A to Declaration of Dr. Brian Moench,

attached as Exhibit 1).  More specifically, exposure to particulate matter has three types of

clinical effects.  The first is that all persons are adversely affected, regardless of age and/or

overall state of health.  Id.  In these populations, PM air pollution causes a low grade

inflammation that impairs the function of all critical organs, and accelerates the aging process,

shortening the average person's life expectancy.  Id. 5-6, 8.

      13.    Second, particulate matter plays a role in triggering and/or aggravating many

chronic diseases such as heart, lung and brain diseases and by doing so causes an increase in

mortality rates.  Id. at 5-8.  That means the subset of the population that is elderly or beset by

serious diseases are at much higher risk from particulate matter, increasing their mortality rates.

Id. at 5, 7-8.

---

[3] See the Utah Division of Air Quality's monitoring data at
http://www.airmonitoring.utah.gov/dataarchive/archpm25.htm and
http://www.airquality.utah.gov/aqp/trend_charts/getData.php?id=slc

[4] See http://www.stateoftheair.org/2012/city-rankings/most-polluted-cities.html

14.     Third, the same inflammation mentioned above is also a serious risk to the very young: children, infants and especially the human embryo.  Id. at 6-7.  The greatest public health consequence of particulate matter is probably its impairment of organogenesis during the most critical phase of human development, the first three months after conception.  Id.  A pregnant mother's exposure to particulate matter can have life long and irreversible consequences to an unborn child, increasing vulnerability to diseases of virtually every organ system.  Id. at 6-7.

15.     Finally, because this case involves regulation of the $PM_{10}$, including $PM_{2.5}$, from Kennecott's mining activities, it is important to note that studies have demonstrated that mine waste, like the 1,100 ft. tall waste rock piles surrounding the Bingham Mine, disperse significant amounts of breathable $PM_{10}$ to local communities and that in those communities, mine waste contributed a substantial portion of the heavy metals in $PM_{2.5}$ and a large majority of the heavy metals in $PM_{2.5}$ and $PM_{10}$.  Id.

## IV.    THE BINGHAM MINE

16.      EPA's approval of the Salt Lake County $PM_{10}$ SIP incorporated by reference a set of state regulations entitled, "Utah State Implementation Plan, Section IX, Part A – Fine Particulate Matter ($PM_{10}$), Appendix A" which set forth particular emission limits on, inter alia, the major sources of $PM_{10}$ pollution in Salt Lake County.  40 C.F.R. § 52.2320(c)(25)(i)(C)

17.     The Bingham Mine is subject to the SIP because of the mine's contribution to unhealthy levels of $PM_{10}$ in and around Salt Lake County.  See 59 Fed. Reg. 35,037. When the SIP was approved in 1994, EPA stated that secondary nitrates and primary $PM_{10}$ emissions from the mining operations contributed to high levels of $PM_{10}$ in Salt Lake County.  Id.

18.     For the "Kennecott Utah Copper – Bingham Canyon Mine," the Salt Lake County $PM_{10}$ SIP specifically states:

Total material moved (ore and waste) shall not exceed 150,500,000 tons per 12-month period without prior approval in accordance with Section 3.1, UACR. Compliance with the throughput limitation shall be determined on a rolling-annual total reported on a monthly basis. On the first day of each new month, a new 12-month total shall be calculated using the previous 12 months.

Utah SIP, Section IX.A – Fine Particulate Matter ($PM_{10}$), Appendix A – Emission Limitations and Operating Practices, Section 2.2W(2); Compl. ¶ 35; Answer ¶ 35 (admission).

19.     Section 3.1 of the Utah Air Conservation Regulations ("UACR") addresses issuance of approval orders, or air quality permits, by the State of Utah.  The rule refers to Utah Admin. Code R307-1-3.1.

20.     In issuing its approval of the 1994 SIP, EPA interpreted Appendix A of the 1994 SIP as follows:

Since State adoption of this $PM_{10}$ SIP, the State has been finalizing the permit conditions for stationary sources.  EPA has discussed and advised the State on the need to ensure consistency with the State's permits and the federally-enforceable SIP. The State's permit program is in the federally-approved SIP.  The final approval to the $PM_{10}$ SIP will also make the emission limitations for the stationary sources federally enforceable.  EPA is giving notice that should different emission limitations exist, EPA will enforce the more stringent of the two (or more) emission limitations.  EPA must have assurance that the attainment demonstration of a nonattainment area plan is maintained.  The less stringent emission limitation may not provide that assurance without a reanalysis of the attainment demonstration.  It is, therefore, critical that the State maintain consistent emission limitations in the permits and in the federally-approved nonattainment-area plan.

59 Fed. Reg. 35,042.

21.     In addition, in 1994, 3.1 UACR provided:

Issuing of an approval order does not relieve any owner or operator of the responsibility to comply with the provisions of these regulations or the State Implementation Plan or other local, state and/or Federal requirements.

Utah Admin. Code R307-1-3.1.4; Compl. ¶ 36; Answer ¶ 36 (admission).  This rule remains part

of the EPA-approved Utah SIP.[5]

      22.     In 1994, UACR regulations also stated:

> All sources with emissions of 25 tons per year or more . . . in areas located in or affecting
> PM10 Non-attainment Areas in Salt Lake and Utah Counties shall meet the emission
> limitations and operating parameters contained in Section 9, Appendix A, of the Utah
> State Implementation Plan (SIP).  Existing sources located in or affecting PM10 Non-
> attainment Areas shall use reasonably available control measures to the extent necessary
> to insure attainment and maintenance of the [NAAQS].  The emission limitation specified
> in the SIP constitute, in the judgment of the Board, reasonably available control measures
> necessary to insure attainment and maintenance of the NAAQS not later than December
> 31, 1994.

Utah Admin. Code R307-1-3.2.4.  This rule remains part of the EPA-approved SIP, but has been

renumbered as Utah Admin. Code R307-305-2.[6]

      23.     The Bingham Canyon copper mine is one of the world's largest open pit copper

mines.  The mine is located southwest of Salt Lake City in the Oquirrh Mountains in Salt Lake

County.  According to Kennecott, the mine is more than 2.75 miles across the top and more than

three quarters of a mile deep, and contains 500 miles of road.  Activities at the mine include

drilling and blasting, loading and hauling, and crushing and conveying.  Compl. ¶ 56; Answer ¶

56 (admitting all statements in paragraph).

      24.     The Bingham Canyon copper mine is regulated under the Utah $PM_{10}$ SIP as a

stationary source of air pollution.  Compl. ¶ 57; Answer ¶ 57 (admission).

---

[5]  EPA maintains a record of the various EPA-approved provisions of the Utah SIP.  The
following link references R307-1-3.1.4:
https://yosemite.epa.gov/R8/R8Sips.nsf/b2af5baa99cc429287256b5f0054df73/b52c4e20925a78d
88725795000769f8f?OpenDocument.

[6]  See
https://yosemite.epa.gov/R8/R8Sips.nsf/b2af5baa99cc429287256b5f0054df73/a4e1fd7c6240171
c872571ea0067bf94?OpenDocument.

25.     Kennecott submits annual reports to the Utah Division of Oil, Gas, and Mining. Compl. ¶ 64; Answer ¶ 64 (admission).  The reports disclose gross ore and waste material moved on an annual basis.  Id.  The reports show that gross ore and waste material moved at the Bingham Canyon copper mine for the years 2006-2010 were: 163,000,000 tons in 2006; 158,960,310 tons in 2007; 169,498,050 tons in 2008; 192,684,252 tons in 2009; and 191,417,264 tons in 2010.  Id.

26.     Kennecott has moved more than 150,500,000 tons of material at the Bingham Canyon copper mine over every 12-month period on a rolling basis starting on January 1, 2007. Compl. ¶ 76; Answer ¶ 76 (admission).  Kennecott is continuing to move more than 150,500,000 tons of material at the Bingham Canyon copper mine over a 12-month period on a rolling basis. Id.

## STANDARD OF REVIEW

"Summary judgment is appropriate 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'"  Somoza v. Univ. of Denver, 513 F.3d 1206, 1211 (10th Cir. 2008); Fed. R. Civ. P. 56(c)(2).  The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).  Disputes about immaterial facts do not preclude summary judgment. Id. at 249-50.  The court must view the evidence in the light most favorable to the non-moving party; however, a scintilla of evidence in favor of the non-moving party is not enough to preclude summary judgment. Id. at 252.

# ARGUMENT[7]

At issue in this case is whether Kennecott may ignore a specific emission limit—the 150.5 million tons-per-year production cap—in the EPA-approved $PM_{10}$ SIP.  This production cap is a critical part of the demonstration Utah made to EPA and the public to establish how the State would improve air quality in Salt Lake County so that its citizens were no longer exposed to heath damaging levels of $PM_{10}$ pollution.  This limit is part of a package of emission reductions Utah and EPA determined was necessary to bring Salt Lake County into attainment and keep Salt Lake County in compliance with health-based air pollution standards.  Importantly, the 1994 SIP, which was promulgated to address both $PM_{10}$ and $PM_{2.5}$ air pollution, is still the legally operative and enforceable SIP today.  Salt Lake County has yet to attain the $PM_{10}$ NAAQS, and EPA has determined that air quality in the county still exceeds the relevant $PM_{10}$ standard.  At the same time, Salt Lake County continues to be plagued by prolonged episodes of acute $PM_{2.5}$ pollution, which when coupled with $PM_{10}$ pollution, constitute a public health crisis for Utah citizens.

It is in this context of Salt Lake County air quality failing to meet both the $PM_{10}$ and $PM_{2.5}$ NAAQS that Kennecott admits that the Bingham Mine has exceeded the 150.5 million tons-per-year production limit since 2006.  See ¶ 26 in Statement of Material Facts above

---

[7]  Plaintiffs have standing to bring this suit on behalf of themselves and their members because: 1) their members have standing to sue in their own right; 2) the interests at stake are germane to Plaintiffs' organizational purposes; and 3) neither the claims asserted nor the relief requested requires Plaintiffs' members to participate directly in the lawsuit.  See Hunt v. Washington State Apple Advertising Commission, 432 U.S. 333, 343 (1977).  Plaintiffs' members have standing to sue in their own right because they have suffered an injury in fact, there is a causal connection between their injury and Kennecott's conduct, and a favorable decision on the merits will likely redress the injury.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).  As shown in the accompanying declarations (attached as Exhibits 1-6), Plaintiffs have established the facts necessary to prove each of these elements.  On August 1, 2012 Plaintiffs provided these declarations to Kennecott's attorneys in response to discovery requests.

("SOMF").  This production limit is an enforceable provision of the Utah PM$_{10}$ SIP approved by

EPA in 1994 and incorporated into the Federal regulations.  See e.g., 40 C.F.R. § 52.2320 et seq.

(incorporating provisions of Utah SIP).  Because there is no dispute over the fact that the

Bingham Mine is exceeding an emission limit prescribed by the 1994 Utah SIP, this Court

should decide, as a matter of law, that Kennecott has violated and is continuing to violate the

Clean Air Act by failing to comply with an emission limit in the federally-approved Utah SIP.  In

other words, Kennecott is not adhering to an emission limit found to be necessary to protect

public health.

In its Answer to Plaintiffs' First Amended Complaint, Kennecott argues that although the

Bingham Mine is exceeding the 150.5 million ton annual production limit, Kennecott received

authorization from the State of Utah through two Approval Orders ("AOs") issued in 1999 and

2011 to increase the mine's production limit.  Answer at 2-3.[8]  Kennecott avers that it "always

receiv[ed] the necessary approvals from the State of Utah before increasing the amount of

material moved" at the Bingham Mine.  Id. at 3.  However, because unilateral approval from the

State to increase an emission limit contained in the Utah SIP has no legal effect unless and until

EPA has approved the production increase as part of a SIP revision, Kennecott must continue to

comply with the production limit in the 1994 Utah SIP.

Although Utah submitted proposed SIP amendments to EPA in 2005 and 2011 that

included Kennecott's requested increases in production limits for the Bingham Mine, EPA has

not approved either of Utah's proposed amendments.  In 2009, the agency formally stated its

intention to disapprove the SIP revision containing the 1999 relaxation of production cap.  In

---

[8]  Page numbers cited for Kennecott's Answer refer to the actual page numbers in the body of the
document and not to the ECF page numbers placed at the top of the Answer with the ECF
caption.

2011, Utah withdrew its proposed SIP revision from EPA consideration.  EPA has taken no action on the revision containing the 2011 relaxation of the production cap.  Therefore, the production limit for the Bingham Mine included in the 1994 SIP is the federally enforceable and legally operable limit with which the mine must comply.  Because Kennecott has not complied with the 150.5 million ton production limit over the last several years, Kennecott has violated the Clean Air Act.

I.   **THE 150.5 MILLION TONS-PER-YEAR PRODUCTION LIMIT IN THE 1994 SALT LAKE COUNTY PM$_{10}$ SIP APPLIES TO THE BINGHAM CANYON MINE AND CAN ONLY BE INCREASED THROUGH THE SIP AMENDMENT PROCESS OUTLINED IN THE CLEAN AIR ACT**

A.   **The 150.5 Million Ton Annual Production Limit for the Bingham Mine is a Federal Regulation.**

Once approved by EPA and published in the Code of Federal Regulations, a SIP becomes Federal law enforceable under the Clean Air Act by EPA, states, or citizens.  42 U.S.C. §§ 7413, 7604.  In 1994, EPA approved the Utah SIP addressing PM$_{10}$ for Salt Lake and Utah Counties. 59 Fed. Reg. 35,036.  This SIP approval incorporated by reference the Utah Air Conservation Regulations ("UACR") along with the "Utah State Implementation Plan, Section IX, Part A – Fine Particulate Matter (PM$_{10}$), Appendix A."  40 C.F.R. § 52.2320(c)(25)(i)(a, c).  Section IX, Part A, Appendix A of the Utah SIP contains emission limitations and other standards for a number of PM$_{10}$ sources including Kennecott's Bingham Mine.  This section of the SIP provides that, for the Bingham Mine, "[t]otal material moved (ore and waste) shall not exceed 150,500,000 tons per 12-month period without prior approval in accordance with Section 3.1, UACR."  SOMF ¶ 18 (full text of the provision in the SIP).  As discussed below, this federal regulation may not be relaxed unilaterally by the State of Utah; rather, Utah must receive

approval from EPA through the formal SIP amendment process to increase Kennecott's annual material moved limit.

**B.    Because Bingham Mine's Production Limit is Part of the Utah SIP, this Limit Can Only be Changed by Amending the Utah SIP.**

Consistent with the Clean Air Act's "federal-state partnership," Abramowitz v. E.P.A., 832 F.2d 1071, 1073 (9th Cir. 1987), states may not unilaterally modify their federally-promulgated SIPs.  Sierra Club v. Tennessee Valley Authority, 430 F.3d 1337, 1346 (11th Cir. 2005) (Section 110(i) of the Clean Air Act "prevents a state from unilaterally modifying any requirement contained in a SIP.").  When a state wants to modify a requirement contained in its SIP, the state must demonstrate that any SIP modification is consistent with the Clean Air Act and obtain EPA approval through federal notice and public comment rulemaking prior to any modification becoming effective.  42 U.S.C. §§ 7410(i), 7602(q); 40 C.F.R. § 51.105.

So fundamental is the principle that a SIP revision cannot take effect until it has been approved by EPA that the United States Supreme Court has held that EPA may bring an enforcement action against a facility for violating an existing SIP even while EPA sits on a proposed revision that might exculpate the source.  General Motors Corp. v. United States, 496 U.S. 530, 540 (1990) ("Both this Court and the Courts of Appeals have recognized that the approved SIP is the applicable implementation plan during the time a SIP revision proposal is pending.") (citations omitted).  Moreover, federal circuit courts have long recognized that SIP revisions only become legally effective after EPA has formally approved the revisions.  See, e.g., U.S. v. Ford Motor Company, 814 F.2d 1099, 1103 (6th Cir. 1987) ("[T]he original emission limit remains fully enforceable until a revision or variance is approved by both the State and EPA.") (citations omitted); Environmental Defense v. EPA, 467 F.3d 1329, 1337 (D.C. Cir. 2006) ("[I]t is settled law that current SIPs remain in force until EPA grants formal approval to a

revision.") (citation omitted).  Accordingly, changing an emission standard or limitation in a previously approved SIP is, at a minimum, a two-step process requiring both State and EPA approval.  A SIP revision will not become effective until EPA formally approves any state-proposed revision.  Until EPA takes action, the emission standards and limitations in the approved SIP remain controlling, must be complied with by regulated sources, and are federally enforceable.

Here, Kennecott has failed to recognize that the AOs it received from Utah in 1999 and 2011 authorizing increased production limits at the Bingham Mine constitute only the first step in the process of revising Utah's SIP to authorize the proposed increases at the mine.  In 1999, Kennecott received an AO from Utah authorizing an increase in annual material movement limits at the Bingham mine from 150.5 million tons (as allowed in the approved SIP) to 197 million tons.[9]  However, Utah did not seek EPA's approval for this SIP modification until 2005. At that time, the State included the increased production limit as part of a broader SIP revision requesting EPA to redesignate Salt Lake County as in attainment with the $PM_{10}$ NAAQS.  74 Fed. Reg. 62,717, 62,718-19 (Dec. 1, 2009) (summarizing Utah's 2005 SIP submittal).  In 2009, EPA proposed to disapprove this SIP revision.  Id. at 62,717.  In 2011, Utah withdrew the 2005 SIP revision at EPA's request, before EPA could formally disapprove it.  Exhibit 7.  Because EPA never approved Utah's 2005 SIP revision containing the increased production limit for the Bingham Mine, the production limit remains at 150.5 million tons as prescribed by the 1994 SIP, and Kennecott must adhere to this limit to be in compliance with the Clean Air Act.

Kennecott has since requested and received from Utah an AO authorizing the Bingham Mine to increase its annual material movement limits from 197 million tons to 260 million tons.

---

[9]  The 1999 AO is included as Exhibit 2 to Kennecott's Answer to Plaintiffs' First Amended Complaint, ECF Doc. No. 22-2.

See Exhibit 3 to Kennecott's Answer to Plaintiffs' First Amended Complaint, ECF Doc. No. 22-

3.  On July 11, 2011 Utah sought EPA's approval to amend the SIP to allow the Bingham Mine

to move 260 millions tons of material on an annual basis.  Exhibit 8.  EPA has not taken action

on this SIP submittal; therefore, the 1994 Utah SIP remains in effect as does the 150.5 million

ton annual limit on material moved at the Bingham Mine.  Kennecott does not dispute that the

Bingham Mine has exceeded this production limit since 2007, SOMF ¶ 25-26.  Therefore,

Kennecott has violated the Utah SIP and the Clean Air Act.

**II.     THE 1999 AND 2011 APPROVAL ORDERS ISSUED BY THE STATE CANNOT
         EXCUSE KENNECOTT FROM COMPLYING WITH THE PRODUCTION
         LIMIT PRESCRIBED BY THE 1994 SALT LAKE COUNTY PM$_{10}$ SIP BECAUSE
         EPA HAS NOT APPROVED A SIP AMENDMENT ALLOWING A
         PRODUCTION LIMIT IN EXCESS OF 150.5 MILLION TONS-PER-YEAR**

Kennecott argues that Utah can unilaterally authorize an increase in the production limit

at the Bingham Mine without amending the SIP because the approved 1994 SIP gave the State

the authority to do so.  Answer at 6; ¶ 68 (averring that "there has been no SIP revision that

would require approval by EPA."); ¶ 69 (averring that "the PM$_{10}$ SIP expressly allows the State

of Utah to increase the material moved limit").  To support this argument, Kennecott relies on

Section IX, Part A, Appendix A of the Utah SIP which provides that for the Bingham Mine

"[t]otal material moved (ore and waste) shall not exceed 150,500,000 tons per 12-month period

without prior approval in accordance with Section 3.1, UACR."  Kennecott interprets this

provision to give the State unilateral authority to change a limit in an approved SIP without first

obtaining EPA's formal authorization of the revision.  However, the plain language of the Clean

Air Act and its implementing regulations, case law, EPA's clarification in Utah's PM$_{10}$ SIP, and

Utah's 2005 and 2011 SIP submittals to EPA all belie Kennecott's argument that it can ignore an

emission limit specifically set forth in an EPA-approved SIP and relied on by EPA, Utah and the

public to demonstrate compliance with the PM$_{10}$ NAAQS.

      **A.**      <u>**According to the Plain Language of the Clean Air Act and Case Law**</u>
<u>**Interpreting that Language, Bingham Mine's Production Limit Cannot be**</u>
<u>**Changed by Unilateral State Action.**</u>

      The statutory language regarding changing a SIP requirement is clear and unambiguous.

Section 110(i) of the Clean Air Act, entitled "Modification of Requirements Prohibited,"

provides that

> Except for a primary nonferrous smelter order under section 7419 of this title, a
> suspension under subsection (f) or (g) of this section (relating to emergency suspensions),
> an exemption under section 7418 of this title (relating to certain Federal facilities), and
> order under section 7413(d) of this title (relating to compliance orders), a plan
> promulgation under subsection (c) of this section, or a plan revision under subsection
> (a)(3) of this section, *no order, suspension, plan revision, or other action modifying any*
> *requirement of an applicable implementation plan may be taken with respect to any*
> *stationary source by the State or by the [EPA] Administrator*.

42 U.S.C. § 7410(i) (emphasis added).  None of these enumerated exceptions is applicable here.

The production limit for the Bingham Mine is a "requirement" included in the Utah SIP.  <u>See</u> 42

U.S.C. § 7602(k) (defining requirement to include "any design, equipment, work practice or

operational standard").  The 1994 Utah SIP is an "applicable implementation plan."  <u>See</u> 42

U.S.C. § 7602(q) (defining applicable implementation plan as any portion of an implementation

plan, "or most recent revision thereof, which has been approved under [42 U.S.C. § 7410.]").

Thus, before Utah may add, delete, or otherwise modify the SIP provision dealing with the

Bingham Mine's production limit, the state must submit the proposed change to EPA for

approval, and must *receive* EPA approval for the change to take effect.  <u>See</u> 40 C.F.R §§ 51.104

(explaining the process for SIP revisions) and 51.105 (explaining that SIP revisions "will not be

considered part of an applicable plan until such revisions have been approved by the

Administrator").  By articulating specific exceptions in Section 110(i), Congress clearly intended

to limit state and EPA authority to unilaterally change a requirement contained in an approved SIP.[10]

There is only one plausible interpretation of the language used in Section 110(i)—that any change to a requirement in an approved SIP only has legal effect when the change has been approved by EPA.[11]  If Congress had intended to give states the discretion to decide whether a change in a SIP provision required EPA approval through the SIP amendment process, Congress would have said so.  See Engine Manufacturers Ass'n v. E.P.A., 88 F.3d 1075, 1089 (D.C. Cir. 1996) (holding that departure from a clear congressional mandate may only be allowed where there is a showing "either that, as a matter of historical fact, Congress did not mean what it appears to have said, or that, as a matter of logic and statutory structure, it almost certainly could not have meant it.").  Instead, Congress allowed unilateral changes to a SIP in a limited set of very specific circumstances, as articulated in the statute.  Approval Orders authorizing increases in the Bingham Mine's production limit do not fit into any of Section 110(i)'s exceptions;

---

[10]  Moreover, as part of a state's retained authority under the Clean Air Act, Congress recognized that states have a right to adopt and enforce standards to control or abate air pollution except where such standards are already in place "under an applicable implementation plan. . .[states] may not adopt or enforce any emission standard or limitation which is less stringent than the standard or limitation under such plan[.]"  42 U.S.C. § 7416.

[11]  The Supreme Court has stressed that, when looking for the plain meaning of a statute, courts must "examine first the language of the governing statute, guided not by a single sentence or member of a sentence, but looking to the provisions of the whole law, and to its object and policy."  John Hancock Mut. Life Ins. Co. v. Harris Trust & Savings Bank, 510 U.S. 86, 94-95 (1993) (internal quotations, brackets, and citations omitted).  See also Beecham v. United States, 511 U.S. 368, 372 (1994) ("The plain meaning that we seek to discern is the plain meaning of the whole statute, not of isolated sentences.").  The Supreme Court has also emphasized that "[o]ur cases express a deep reluctance to interpret a statutory provision so as to render superfluous other provisions in the enactment."  Pa. Dept. of Public Welfare v. Davenport, 495 U.S. 552, 562 (1990).  Statutes are to be given, wherever possible, such effect that no clause, sentence or word is rendered superfluous, void, contradictory or insignificant.  United States v. Menasche, 348 U.S. 528, 538-39 (1955); see also Bridger Coal Co./Pacific Minerals, Inc. v. Director, Office of Workers Compensation Programs, 927 F.2d 1150, 1153 (10th Cir. 1991) ("We will not construe a statute in a way that renders words or phrases meaningless, redundant, or superfluous.").

therefore, the Bingham cannot increase its production limit beyond 150.5 million tons until EPA has approved the AOs in the context of a SIP amendment.

In a situation similar to the one here, where a facility was exceeding an emission standard contained in a federally-approved SIP that had been unilaterally relaxed by the state through the state's regulatory process, the Eleventh Circuit held that the facility was not excused from complying with the limit in the SIP since the State's relaxed standard had not been approved by EPA.  Sierra Club v. Tennessee Valley Authority, 430 F.3d 1337, 1349 (11th Cir. 2005).  In Sierra Club, Alabama's federally-approved SIP imposed a 20% opacity limit on permitted sources.  Id. at 1340.  However, Alabama promulgated a new rule—the 2% de minimus rule— that allowed a permitted source to exceed the 20% opacity limit for up to two percent of the source's quarterly operating hours.  Id. at 1342.  The Sierra Club sued TVA, claiming that TVA's Colbert plant was violating the 20% opacity limit contained in the Alabama SIP.  Id. at 1339.  TVA argued that none of the exceedances were violations of the opacity limit because they were within the "forgiveness zone" of the state's the 2% de minimus rule.  Id.  The Rule essentially revised the 20% opacity limitation contained in the SIP, and a "revision by any other name is still a revision" which, if not approved by EPA, is invalid under Section 110(i) of the Clean Air Act.  Id. at 1347.  The court recognized the state's Rule as "an attempt to unilaterally revise the opacity limitation without submitting the revision to the rigors of the SIP amendment process" and EPA oversight of the SIP process.  Id. at 1348-49.

The statute unambiguously states that unless one of the enumerated exceptions in Section 110(i) apply, any change to a SIP requirement requires EPA approval for that change to have legal effect.  Therefore, Kennecott must comply with the production cap in the 1994 $PM_{10}$ SIP unless and until EPA approves the increased production limits as an enforceable SIP amendment.

**B.      EPA's Clarification in Utah's PM$_{10}$ SIP Indicates that Approval
            Orders May Not Excuse Kennecott from Complying with the Production
            Cap in the Utah SIP.**

Initially, acknowledging the fundamental principle that a SIP may not be modified

without EPA approval, EPA itself rejected Kennecott's "prior approval" argument when it issued

the Utah SIP in 1994.  The agency stated, as it was required to do by federal law, that:

> Since State adoption of this PM$_{10}$ SIP, the State has been finalizing the permit conditions
> for stationary sources. EPA has discussed and advised the State on the need to ensure
> consistency with the State's permits and the federally-enforceable SIP.  The State's
> permit program is in the federally-approved SIP.  The final approval to the PM$_{10}$ SIP will
> also make the emission limitations for the stationary sources federally enforceable.  EPA
> is giving notice that should different emission limitations exist, EPA will enforce the
> more stringent of the two (or more) emission limitations.  EPA must have assurance that
> the attainment demonstration of a nonattainment area plan is maintained.  The less
> stringent emission limitation may not provide that assurance without a reanalysis of the
> attainment demonstration.  It is, therefore, critical that the State maintain consistent
> emission limitations in the permits and in the federally-approved nonattainment-area
> plan.

59 Fed. Reg. 35,042.[12]  Thus, EPA gave "notice" that the emission limits in the Utah SIP

constitute Federal law and where an AO purports to relax Utah SIP emission limit, EPA will

---

[12]  It is true that EPA's statement continues, noting that "EPA has agreed to allow the State to
*update* the emission limitations section of the SIP once a year, i.e., by September of each year
beginning 1993. The tracking of this effort will be documented annually in the EPA/State
Agreement." Id. (emphasis added).  Initially, this statement does nothing to contradict EPA's
previous contention, which is well-founded in the law, that to "assur[e] that the attainment
demonstration of a nonattainment area plan is maintained," EPA must enforce the very SIP
emission limits that served as a basis for that attainment demonstration.  In other words, without
EPA approval of a SIP revision, there can be no assurance that any "less stringent" emission
limit would achieve what a SIP is required to achieve—attainment of the NAAQS.  Thus, in this
context and in light of the plain legal mandate of section 110(i), EPA must be understood as
suggesting that, as Utah "finaliz[es] the permit conditions for stationary sources," the state may
append additional emission limits to the SIP.  After all, such additional emission limits would not
undermine the SIP demonstration, which has already been made, but would only add more air
quality protection.  In any case, as EPA makes clear, any "updates" to the SIP may not relax the
emission limits already in the SIP, as those will continue to be federally enforceable.  To do so,
without EPA approval, would mean that Utah would no longer have demonstrated to EPA's
satisfaction that the combination of measures set forth in the SIP would assure attainment of the
NAAQS.

enforce the emission limit in the SIP.[13]  As a result, the federal agency with the authority and

expertise to interpret the EPA-approved Utah SIP plainly rejected Kennecott's prior approval

contention and maintained instead that, while a properly promulgated AO could strengthen an

emission limit, an AO may not serve to ease a SIP emission limit.

Moreover, in subsequent opportunities to make its interpretation of the Utah SIP known,

EPA consistently maintained that the 1994 SIP did not allow Utah to modify the plan's emission

limits without first securing EPA approval.  For example, in a 2002 approval of a revision to the

Utah County $PM_{10}$ SIP, EPA had this to say about the "Director's Discretion Provisions" such as

the one at issue here contained in Section IX.A of the 1994 Salt Lake County SIP:

> The original EPA-approved $PM_{10}$ SIPs for Utah County and Salt Lake County contain
> provisions that some would argue allow the Executive Secretary of the State of Utah to
> make changes effective to the SIP without first obtaining EPA approval.  We believe
> these "director's discretion" provisions contrary to the CAA and should not have been
> approved into the SIP.  At the very least, these provisions have led to uncertainty
> regarding the content of the federally enforceable SIP.

67 Fed. Reg. 78,181, 78,185 (Dec. 23, 2002).  For the Utah County $PM_{10}$ SIP revision, Utah

acknowledged EPA's 1994 understanding of the SIP by including language stating that any

changes to the $PM_{10}$ SIP revision would not "change the federal enforceability of the emissions

limits or other requirements of the Utah County $PM_{10}$ SIP without EPA approval of such changes

as a SIP revision."  Id.  EPA approved this language confirming again that it would not allow

Utah to "unilaterally change the limits and requirements of the federally enforceable SIP, and

that Utah's changes to elements of the SIP will not be federally effective without EPA's

---

[13]  EPA is not being inconsistent here by saying that it would enforce a more stringent limit in an
AO even where the SIP provided a less strict emission limit.  This is because a permit may
reflect compliance with a whole host of Clean Air Act requirements, such as the requirement that
a source making a major modification to its facility is subject to an emission limit based on "best
available control technology."  Plainly, such an emission limit could well be more stringent than
a SIP emission limit and is enforceable as such.

approval."  Id.  EPA went on to say that Utah had committed to work with EPA "to permanently

resolve the director's discretion issues in the Salt Lake County and Utah County PM$_{10}$ SIPs."  Id.

   Again, in its 2009 proposed denial of Utah's request to redesignate Salt Lake County as

in attainment with the PM$_{10}$ NAAQS, EPA explicitly rejected language in the SIP that would

allow the State to unilaterally change requirements for the Kennecott Power Plant without EPA's

approval.  74 Fed. Reg. 62,726.  According to EPA:

> This revision would undermine the enforceability of the SIP because a control measure
> relied on in the maintenance plan could be changed through an Approval Order, making
> the original limit unenforceable.  Also the process for issuing an Approval order is an
> inadequate substitute for revising the SIP.  The latter requires EPA approval and public
> involvement at both state and Federal levels. *Section 110(i) of the Act. . .does not allow a
> state to revise stationary source SIP requirements through issuance of Approval Orders*.

Id. (emphasis added).  Clearly, both EPA and Utah recognize that the language in Section IX.A

of the 1994 SIP stipulating that the production limit at the Bingham Mine shall not exceed 150.5

million tons annually "without prior approval in accordance with Section 3.1, UACR" may not

be interpreted to allow unilateral revision of the SIP in violation of the Clean Air Act.  Likewise,

both EPA and Utah acknowledge that the emission limits in the 1994 SIP, such as the production

cap, constitute Federal law and are enforceable in Federal court.

   EPA has consistently articulated its position that emission limits in Appendix A are

federally enforceable and that any provisions of the Utah SIP that purport to give the State

"discretion" to unilaterally amend the SIP may not be interpreted in a manner contrary to the

Clean Air Act. In other words, as EPA has repeatedly stated, unless and until proposed revisions

to the SIP are approved by the agency and Utah has demonstrated to EPA's satisfaction that

those revisions demonstrate attainment of the NAAQS, the emission limits in the existing, EPA-

approved SIP are those that govern operations at the affected facilities.[14]   Further, EPA's position

that to be valid, a change in a SIP requirement must be approved by EPA through the SIP

amendment process, is entitled to deference because it complies with the law and EPA is the

agency charged with administering the Clean Air Act.  U.S. v. Mead, 533 U.S.218, 227-28

(2001) ("We have long recognized that considerable weight should be accorded to an executive

department's construction of a statutory scheme it is entrusted to administer.") (citation omitted).

Accordingly, Kennecott's argument that it has not violated the SIP because the 1999 and 2011

AOs authorize an increase in the production limit is unavailing because EPA has not approved

either of the proposed production limits.

      C.     **Utah's Inclusion of the Increased Production Cap in Its SIP Submissions**
            **Seeking EPA Approval Also Indicates that Approval Orders May Not**
            **Excuse Kennecott from Complying with the Production Cap in the Utah SIP.**

Utah's submittal of SIP revisions to EPA in 2005 and 2011 that included the production

limits for the Bingham Mine authorized in the AOs further demonstrates that the State was aware

that it required EPA approval to change the production limits in the 1994 SIP.  As discussed

above, neither the 2005 SIP revision, which Utah withdrew in 2011, nor the 2011 SIP revision

was approved by EPA.  Although Utah approved the production limit increases in the AOs, this

is only the first step toward revising the SIP to include a new production limit for the Bingham

Mine.  The requisite second step—EPA approval—has not yet occurred.  Therefore, Kennecott

must comply with the production limits in the 1994 SIP.  U.S. v. Ford Motor Company, 814 F.2d

1099, 1103 (6th Cir. 1987) ("[T]he original emission limit remains fully enforceable until a

revision or variance is approved by both the State and EPA.")

---

[14]   As explained above, an air quality permit may require emission limits that are more strict that
those in a SIP.  In such a case, as EPA made clear in 1994, it is the stricter of the two emission
limits that is applicable to the source.  After all, the various requirements of the Clean Air Act
may mandate a reduction in emissions in order to comply with other aspects of the Act.

**D.** **Utah's Own Air Conservation Regulations Support the Only Proper Interpretation of the PM$_{10}$ SIP—that the SIP Emission Limits Remain Enforceable Unless and Until EPA Approves any SIP Revision that Changes the Limits.**

Analysis of the relevant Utah regulations that were in effect at the time that EPA

approved the PM$_{10}$ SIP, and that remain valid today, further shows that Kennecott has

misinterpreted the SIP's "prior approval in accordance with Section 3.1, UACR" provision.

Approval Orders are part of Utah's permitting process for stationary sources of air pollution.

UACR 3.1, or section 3.1 of the Utah Air Conservation Regulations, addresses issuance of

approval orders, or air permits, by the State of Utah.  The rule refers to Utah Admin. Code R307-

1-3.1.  Among other things, the UACR states:

> Issuing of an approval order does not relieve any owner or operator of the responsibility to comply with the provisions of these regulations or the State Implementation Plan or other local, state and/or Federal requirements.

R307-1-3.1.4.[15]  Thus, the very regulations on which Kennecott relies acknowledge what is

explicit under federal law—regardless of the terms and conditions of a particular air quality

permit, a source must comply with any emission limits contained in an EPA-approved SIP.

After all, compliance with an EPA-approved SIP is most certainly a federal requirement.

Further acknowledging this principle, Utah's regulations provide that "[a]ll sources with

emissions of 25 tons per year or more . . . in areas located in . . . PM$_{10}$ Non-attainment Areas in

Salt Lake and Utah Counties," including Kennecott "*shall meet* the emission limitations and

---

[15]  Since 1994, the UACR have been renamed and renumbered by the State of Utah, although the provisions of UACR 3.1 remain incorporated into the Utah SIP.  See 70 Fed. Reg. 59688 (Oct. 13, 2005) (stating "current rule sections R307-1-3.1.1, R307-1.3.1.2, R307-1.3.1.3, *R307-1.3.1.4*, R307-1.3.1.5, R307-1.3.1.6, R307-1.3.1.8, R307-1.3.1.9, and R307-1.3.1.10...will remain in the existing SIP.") (emphasis added).  Accordingly, the language of this provision remains part of the enforceable SIP regardless of subsequent language changes that have not been approved by EPA.

operating parameters contained in Section 9, Appendix A, of the Utah State Implementation Plan

(SIP)."  Utah Admin. Code R307-305-2 (emphasis added).  Again, Utah's regulations underscore

that the SIP's "prior approval" language does not authorize Kennecott to ignore an emission limit

in the EPA-approved $PM_{10}$ SIP.  Rather, these rules state that the company must comply with the

emission limits in Appendix A precisely because these limits constitute, "in the judgment of the

[Air Quality] Board, reasonably available control measures necessary to insure attainment and

maintenance of the NAAQS not later than December 31, 1994." Id.[16]  Therefore, Utah rules

echo EPA's assertion—the only assertion valid under the law—that because emission limits in

an EPA-approve SIP have been determined by EPA, Utah and the public to be necessary for

attainment, these limits may not be relaxed without a finding by EPA that the proposed limits

still demonstrate compliance with and maintenance of the NAAQS.  As EPA has made no such

determination relative to AO emission limits or Utah's proposed SIP revisions, the emission

limits that were part of the 1994 SIP demonstration—such as the production cap on the Bingham

Mine—govern Kennecott's operations.  Accordingly, issuance of an AO does not relieve

---

[16]  It is true that Utah Admin. Code R307-305-2 further states that "[s]pecific limitations for installations within a source may be adjusted by order of the Board provided the adjustment does not adversely affect achieving the applicable NAAQS."  However, for several reasons, this provision does not help Kennecott.  As an initial matter, Utah Admin. Code R307-305-2 must be read as prohibiting, under state law, revision of Appendix A emission limits through an AO.  Rather, such revisions must be achieved under state law, if at all, though a Board order. This is true because AOs are issued by the Executive Secretary and not by the Air Quality Board.  See Utah Admin. Code R307-1-3.1.  As Kennecott's "prior approval" contention is based on the 1999 and 2011 AOs, which are not Board orders, it must be rejected contrary to R307-305-2. Finally, EPA has formally stated that Utah's proposed revisions to the $PM_{10}$ SIP do "adversely affect achieving" the $PM_{10}$ NAAQS and more specifically, that unilateral changes to SIP emission limits undermine the $PM_{10}$ SIP's attainment demonstration.  In addition, Salt Lake County is still not meeting the $PM_{10}$ NAAQS.  As a result, there can be no finding that a relaxation of the production cap has not "adversely affected" and will not "adversely affect" achievement of the $PM_{10}$ NAAQS.

Kennecott from the responsibility of complying with the Utah SIP or other applicable State and Federal laws.

## **CONCLUSION**

For the foregoing reasons, the Citizen Groups respectfully request that this Court grant their Motion for Summary Judgment and declare that Defendant Kennecott Utah Copper is in violation of the Utah SIP for failing to comply with the 150,500,000 ton limit on total material moved and consequently is also in violation of the Clean Air Act, 42 U.S.C. § 7604(a)(1)(A).

Respectfully submitted on this 25th day of January 2013.

/s/ Samantha Ruscavage-Barz
Samantha Ruscavage-Barz
NM Bar. No. 23276
WildEarth Guardians
516 Alto Street
Santa Fe, New Mexico  87501
Tel. 505-988-9126 x1158/Fax 505-213-1895
sruscavagebarz@wildearthguardians.org

*Attorney for WildEarth Guardians and the Sierra Club*

/s/ Joro Walker
Joro Walker, USB# 6676
Charles R. Dubuc, Jr., USB # 12079
150 South 600 East, Ste. 2A
Salt Lake City, Utah  84102
Tel. 801.487.9911
jwalker@westernresources.org
rdubuc@westernresources.org

*Attorneys for Utah Physicians for a Healthy Environment and Utah Moms for Clean Air*

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of January, 2013, a true and correct copy of the foregoing **PLAINTIFFS MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** was filed electronically with the Clerk of Court using the CM/ECF system which will send notification of such filing to all attorneys of record.

/s/ Samantha Ruscavage-Barz