IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UTAH PHYSICIANS FOR A HEALTHY ENVIRONMENT, WILDEARTH GUARDIANS, UTAH MOMS FOR CLEAN AIR, and SIERRA CLUB, | **MEMORANDUM DECISION AND ORDER** |
| Plaintiffs, | |
| v. | Case No. 2:11-CV-01181 |
| KENNECOTT UTAH COPPER, LLC, | Judge Robert J. Shelby |
| Defendant. | |

Plaintiffs Utah Physicians for a Healthy Environment, WildEarth Guardians, Utah Moms for Clean Air, and Sierra Club (Citizen Groups) filed this citizen suit alleging that Defendant Kennecott Utah Copper, LLC has violated the Clean Air Act (CAA).[1]  Citizen Groups and Kennecott both moved for summary judgment.[2]  Because the court concludes that Kennecott has complied with the unambiguous plain language of the controlling federal regulation, the court grants Kennecott's Motion for Summary Judgment and denies Citizen Groups' Motion for Summary Judgment.

---

[1] Dkt. 16 at 1.

[2] Dkt. 38; Dkt. 40.

1

## BACKGROUND

At its core, this case is about the legal interpretation of a federal regulation enacted pursuant to the CAA to limit the production of certain pollutants into the air in Salt Lake County. The CAA regulates air quality in the United States through a federal-state partnership.[3]  The Environmental Protection Agency develops National Ambient Air Quality Standards (NAAQS) for each criteria pollutant, of which there are currently six.[4]  One of the criteria pollutants regulated by EPA is particulate matter, in two particle size ranges: $PM_{10}$—less than 10 microns in diameter but greater than 2.5 microns in diameter; and $PM_{2.5}$—equal to or less than 2.5 microns in diameter.[5]

EPA sets the NAAQS at levels necessary to protect public health and welfare.[6]  Once EPA promulgates these standards, the states are responsible for ensuring that pollution does not exceed them.[7]  Each state is divided geographically into air quality control regions.[8]  With input from the states, EPA issues formal designations on whether each air quality control region meets the NAAQS.[9]  Air quality control regions that meet the NAAQS for a given pollutant are designated attainment areas, while air quality control regions that do not are designated nonattainment areas.[10]

---

[3] *US Magnesium, LLC v. EPA*, 690 F.3d 1157, 1159 (10th Cir. 2012) (calling the scheme a "cooperative-federalism approach").

[4] *See* 42 U.S.C. § 7409(a); 40 C.F.R. §§ 50.4–50.19.

[5] 40 C.F.R. §§ 50.6, 50.7, 50.13.

[6] 42 U.S.C. § 7409(b).

[7] *Id.* § 7407(a) ("[E]ach state shall have primary responsibility for assuring air quality within" the state.)

[8] *See id.* § 7407(b).

[9] *Id.* § 7407(d).

[10] *Id.*

States are required to adopt State Implementation Plans (SIPs) detailing methods each state will use to attain and maintain the NAAQS in each air quality control region.[11]  SIPs must "include enforceable emission limitations and other control measures, means, or techniques . . . as may be necessary or appropriate to meet the applicable requirements" of the CAA.[12]  States submit the SIPs to EPA, which reviews the plans to determine if they meet the requirements of the CAA.[13]  If a SIP satisfies the applicable requirements, EPA must approve it.[14]

Once EPA approves a SIP, it becomes federal law enforceable in appropriate circumstances by the promulgating state, EPA, and interested individuals.[15]  "EPA may require a state to alter an approved SIP if it finds, through notice-and-comment rulemaking, that the SIP 'is substantially inadequate to attain or maintain the relevant [NAAQS] . . . or to otherwise comply with any requirement of [the CAA].'"[16]  If EPA finds that an approved SIP is substantially inadequate, it can require the relevant state to revise the SIP by issuing a SIP call.[17]  If the state fails to revise the SIP, EPA can assume control over the implementation of the CAA in the state.  EPA can also issue a SIP correction if it decides that it erred in approving a provision in a SIP.[18]

---

[11] *See id.* §§ 7407(a), 7410.

[12] *Id.* § 7410(a)(2)(A).

[13] *Id.* § 7410.

[14] *Id.* § 7410(k)(3) ("[T]he Administrator shall approve such submittal as a whole if it meets all the applicable requirements of this chapter."); *National Parks Conservation Ass'n, Inc. v. Tenn. Valley Auth.*, 175 F. Supp. 2d 1071, 1074 (E.D. Tenn. 2001) ("EPA reviews the SIP to determine whether it meets specified criteria and, if it does, EPA must approve it.").

[15] *US Magnesium,* 690 F.3d at 1159.

[16] *Id.* at 1160 (quoting CAA § 110(k)(5), 42 U.S.C. § 7410 (k)(5)).

[17] 42 U.S.C. §§ 7410 (a)(2)(H) & (k)(5).

[18] *Id.* § 7410 (k)(6).

Citizens also have several routes under the CAA to challenge a SIP or call for its implementation.  Through Section 307 of the CAA citizens can challenge both EPA's decision to approve a SIP, as well as the content of the SIP itself.[19]  Citizens must file Section 307 challenges within 60 days of EPA's final SIP approval.  Jurisdiction over these challenges rests with the appropriate federal court of appeals.[20]  Citizens can also allege a violation of an emission standard or limitation in a SIP under Section 304(a) of the CAA.[21]  Federal district courts have jurisdiction over these types of challenges.  Section 304(a)(2) also permits citizens to attempt to force EPA to make a SIP call by claiming that EPA failed to perform a non-discretionary act.[22]

The dispute in this case involves the interpretation of the $PM_{10}$ SIP for the Salt Lake County air quality control region, which EPA approved in 1994.[23]  Citizen Groups bring a Section 304(a) challenge under the CAA, alleging Kennecott is in violation of the 1994 $PM_{10}$ SIP as written.  The 1994 $PM_{10}$ SIP regulates Kennecott's Bingham Canyon Mine, which is located in the Salt Lake County nonattainment area, as a stationary source of air pollution.[24]  The Mine is included in the SIP because it generates a significant amount of particulate pollution through the movement of material during the mining process.  A provision in the SIP limits the total amount of material that Kennecott may move at the Mine within each 12-month period in order to limit particulate pollution.  Referencing the Utah Air Conservation Regulations (UACR), the SIP provides, "Total material moved (ore and waste) shall not exceed 150,500,000 tons per 12-month

---

[19] *Id.* § 42 U.S.C. § 7607(b).

[20] *Id.*

[21] *Id.* § 7604(a)(1)(A).

[22] *Id.* § 7604 (a)(2).

[23] *See* 40 C.F.R. § 52.2320–52.2355; *see, e.g.,* Dkt. 16 at 20;  59 Fed. Reg. 35,036 (July 8, 1994).

[24] Dkt. 40 at 20.

period without prior approval in accordance with Section 3.1, UACR."[25]  The SIP incorporates the referenced UACR.[26]

Since 1994, Kennecott has twice sought and received Approval Orders from the State of Utah in accordance with Section 3.1 of the UACR.  These Approval Orders authorized increases in the limitation on the total amount of material Kennecott may move at the Mine.[27]  In 1999, the State approved an increase in the material moved limit to 197 million tons per year; and in 2011, the State increased the limit to 260 million tons per year.[28]  Relying on these Approval Orders, Kennecott has exceeded every year since 2006 the 150.5 million tons per year material moved limitation in the 1994 $PM_{10}$ SIP.[29]  Kennecott, however, has only increased its material moved after first securing approval from the State, and has not exceeded either the 197 million ton per year limit specified in the 1999 Approval Order or the 260 million ton per year limit specified in the 2011 Approval Order.[30]

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[31]  In determining whether there is a genuine issue of fact, the court "view[s] the evidence and make[s] all reasonable inferences in

---

[25] Dkt. 39-1 at 2.

[26] Dkt. 40 at 24; 40 C.F.R. § 52.2320(c)(25)(i)(a)–(c).

[27] Dkt. 39-6; Dkt. 39-11.

[28] *Id.*

[29] Dkt. 45 at 14–15.

[30] Dkt. 38 at 13; Dkt. 47 at 4.

[31] FED. R. CIV. P. 56(a).

the light most favorable to the nonmoving party."[32]  In the present case, which turns on the legal interpretation of a regulatory provision, the facts are not in dispute in any relevant respect.

## ANALYSIS

In their cross motions for summary judgment, the Parties disagree about the meaning of the material moved provision of the 1994 $PM_{10}$ SIP for Salt Lake County.  The provision reads:

> Total material moved (ore and waste) shall not exceed 150,500,000 tons per 12-month period without prior approval in accordance with Section 3.1, UACR.[33]

Citizen Groups allege that Kennecott has failed to comply with the 1994 $PM_{10}$ SIP and its limit on material moved.[34]

In response, Kennecott argues that the court lacks jurisdiction over Citizen Groups' challenge and that it has met the requirements of the SIP's material moved provision by obtaining Approval Orders before moving material in excess of the 150.5 million ton per year limit.  Citizen Groups contend that the Approval Orders on their own could not authorize a deviation from the specified material moved limit in the SIP.  In Citizen Groups' reading, obtaining State approval in accordance with Section 3.1 of the UACR is a necessary but not sufficient condition for exceeding the 150.5 million ton per year limit.[35]  Citizen Groups argue that the SIP requires Kennecott to secure approval from EPA in addition to the State. Alternately, Citizen Groups argue that Kennecott was required to modify the SIP through approved processes before moving material at present levels.

---

[32] *N. Natural Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008).

[33] Dkt. 39-1 at 2.

[34] Dkt. 16 at 20.

[35] *E.g.,* Dkt. 40 at 14.

This case is divided into two phases. Phase 1 is "focused exclusively on liability." And Phase 2, if necessary, will be "focused on remedies, including injunctive relief and/or penalties."[36] Both Parties have moved for summary judgment on the question of liability.[37]

Below, the court first addresses the threshold jurisdiction issue, concluding that the court has jurisdiction over the Citizen Groups' challenge. Next, the court addresses the merits of the pending motions. The court concludes that the plain language of the SIP authorizes an increase in material moved once the State issues a valid Approval Order pursuant to Section 3.1 of the UACR, and that neither EPA approval nor a modification to the SIP itself is necessary for Kennecott to move material above the default limit. Kennecott is thus in compliance with the SIP as written, and is not liable under the CAA. The court grants summary judgment in Kennecott's favor.

## I.     Jurisdiction

Kennecott argues that Citizen Groups lack standing to bring this suit because they are actually challenging the legality of the SIP's material moved provision.[38] The court agrees that Citizen Groups lack standing to challenge the legality of the SIP, but concludes that they are instead permissibly challenging Kennecott's compliance with the SIP as written. The court has subject-matter jurisdiction in this case based on the citizen suit provision of the CAA, which provides a right to sue in federal district court any person "who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of … an

---

[36] Dkt. 32 at 2.

[37] Dkt. 38; Dkt. 40.

[38] Dkt. 38 at 18–20.

emission standard or limitation."[39]   A standard or limitation contained within a SIP expressly meets this definition.[40]

Citizen Groups have sued Kennecott "to enforce the 1994 [PM$_{10}$] SIP as it applies to the company's mining operations."[41]   Kennecott argues, in response, that it has complied with the SIP.  Because the question of liability turns on whether Kennecott has violated the SIP, and thus the CAA, the court has jurisdiction over the action.  The court's jurisdiction, however, is limited to the narrow issue of whether Kennecott violated the 1994 PM$_{10}$ SIP for Salt Lake County.[42]

## II.   Material Moved Provision of Utah's PM$_{10}$ SIP for Salt Lake County

Having concluded the court has jurisdiction to decide if Kennecott has violated the SIP as written, the court now interprets the contested language of the SIP.  In interpreting a regulation, courts apply "general rules of statutory construction, beginning with the plain language of the regulations."[43]   Normally, when the regulatory language is plain and unambiguous, the court's sole function is to "enforce it according to its terms."[44]   But, "the plain language of a regulation . . . will not control if 'clearly expressed [administrative] intent is to the contrary or [if] such plain meaning would lead to absurd results.'"[45]   Here, if the plain language of the material moved provision is unambiguous, not contrary to any clearly expressed administrative intent, and not absurd, then the court will apply the provision's plain meaning.

---

[39] 42 U.S.C. § 7604(a)(1).

[40] *Id.* § 7604(f)(4).

[41] Dkt. 47 at 8; *See* Dkt. 16 at 20.

[42] 42 U.S.C. § 7607(b)(1)–(2); *United Steelworkers  v. Oregon Steel Mills, Inc.*, 322 F.3d 1222, 1225–26 (10th Cir. 2003); *see* Dkt. 38 at 18.

[43] *Time Warner Entm't Co., L.P. v. Everest Midwest Licensee, L.L.C.*, 381 F.3d 1039, 1050 (10th Cir. 2004).

[44] *Sebelius v. Cloer*, 133 S. Ct. 1886, 1896 (2013) (citation omitted).

[45] *Safe Air For Everyone v. EPA*, 488 F.3d 1088, 1097 (9th Cir. 2007) (quoting *Dyer v. United States*, 832 F.2d 1062, 1066 (9th Cir.1987)).

Below, the court looks to the plain meaning of the material moved provision and considers whether the provision is ambiguous. Concluding that the unambiguous plain language of the regulation supports Kennecott's position, the court then turns to the Citizen Groups' two arguments against this interpretation. First, the court considers whether the plain-language interpretation of the material moved provision is contrary to any clearly expressed regulatory intent; and second, the court considers whether the plain-language interpretation would lead to absurd results given the regulatory context. Finding that the Citizen Groups have failed to show contrary clearly expressed regulatory intent or absurdity, the court gives the regulation its plain meaning.

### A. The Plain Meaning Allows for Unilateral State Approval

The material moved provision states:

> Total material moved (ore and waste) shall not exceed 150,500,000 tons per 12-month period without prior approval in accordance with Section 3.1, UACR.

A straightforward reading of this provision prohibits Kennecott from moving material in excess of the default limit, unless it first receives approval in accordance with Section 3.1 of the UACR. Kennecott can comply with the material moved provision in two ways: adhering to the default limit, or obtaining approval prior to exceeding it. Kennecott moved material in excess of the 150.5 million ton per year default limit over every 12-month rolling period since January 1, 2007.[46] It did so, however, in reliance on valid Approval Orders issued by the State of Utah, in accordance with Section 3.1 of the UACR.[47] The material moved provision does not mention or suggest any other conditions or approvals in addition to the clearly required State approval.

---

[46] Dkt. 45 at 14–15.

[47] Dkt. 47 at  4.

Citizen Groups nevertheless argue that the plain meaning of the provision also requires EPA approval before Kennecott may exceed the 150.5 million ton per year limit.  They stress, "the plain meaning of a regulation is 'guided not by a single sentence or member of a sentence, but by looking to the provisions of the whole law, and to its object and policy.'"[48] This is a correct statement of law relating to statutory interpretation, but Citizen Groups do not point to other provisions in the SIP to inform the court's reading of the material moved provision.  They focus instead on the "object and policy," and argue "the SIP provision at issue here must be read not only in the context of the goals of the 1994 $PM_{10}$ SIP, but also based on what the Clean Air Act requires."[49]  They argue that because the overriding goal of the SIP is to reduce particulate pollution, and Kennecott is a major source of such pollution, it is inconsistent with the goals of the SIP to allow the State to unilaterally increase the amount of material Kennecott can move.[50] In effect, the Citizen Groups are not arguing that the plain language requires EPA approval, but rather that the plain language of the provision is inconsistent with the statutory scheme of the CAA.  The court considers this argument below when it addresses Citizen Groups' contention that clearly expressed administrative intent and avoiding absurd results requires the court to read the material moved provision to necessitate EPA approval of any increase.[51]  As discussed in detail below, the court finds these arguments unpersuasive.

The Citizen Groups' plain-language argument is also contrary to the language of the SIP as interpreted through well-established cannons of statutory construction.  First, the Citizen Groups fail to address how requiring EPA approval allows for consistent interpretation of

---

[48] Dkt. 47 at 10 (quoting *John Hancock Mut. Life Ins. Co. v. Harris Trust & Savings Bank*, 510 U.S. 86, 94–95 (1993) (internal quotations and citations omitted)).

[49] Dkt. 47 at 11.

[50] *Id.* at 10–12.

[51] *Infra* § II(c).

identical language used elsewhere in the same section of the SIP.  The "normal rule of statutory construction" provides that "identical words used in different parts of the same act are intended to have the same meaning."[52]  The SIP uses the words "without prior approval in accordance with Section 3.1, UACR" twice in the Bingham Canyon Mine section.  In a provision that appears just three pages after the material moved provision, the SIP states:

> The following operating parameters shall not be exceeded *without prior approval in accordance with Section 3.1, UACR:*
>    A.  Maximum daily total mileage for haul trucks (30,000 miles)
>    B.  Minimum design payload per haul truck (150 tons)
>    C.  Maximum number of wheels per haul truck (6 wheels)
>    D.  Any new haul trucks purchased will be rated at the indicated minimum net payload weight (190 tons)[53]

Citizen Groups have provided no reason why the court should interpret these two uses of the same language in the same section of the SIP differently.  Given the CAA's cooperative-federalism approach—where the EPA sets the NAAQS and the states are responsible for determining the methods they will use to attain and maintain pollution below these limits—it seems very unlikely that EPA approval or formal amendment of the SIP would be required before Kennecott could, for example, change the number of wheels on its haul trucks.  Nor do Citizen Groups suggest this result.  If the State could unilaterally approve operational changes under this provision of the SIP, then the same language used just pages later in the material moved provision cannot be interpreted to yield a different result.

Further, generally when the drafter of a statute "includes particular language in one section of a statute but omits it in another . . . [the court] presumes that [the drafter] intended a difference in meaning."[54]  This canon of construction also weighs against the Citizen Groups'

---

[52] *Taniguchi v. Kan Pacific Saipan, Ltd.*, 132 S. Ct. 1997, 2004–05 (2012) (citation omitted).

[53] Dkt. 39-1 at 115 (emphasis added).

[54] *Daizell v. RP Steamboat Springs, LLC*, 781 F.3d 1201, 1209 (10th Cir. 2015) (internal quotation marks omitted).

plain-language argument.  Several SIP provisions impose EPA approval conditions openly, not

silently.  Two provisions of the Utah Administrative Code that were incorporated into the SIP

expressly require the Executive Secretary of the State of Utah to "obtain concurrence from EPA

when approving" deviations from specified measures, limits, or schedules relating to both sulfur

and ozone.[55]

In contrast, the material moved provision does not suggest any condition beyond the one

it identifies.  Nothing in the language of the material moved provision references, or invites

reference, to any other set of conditions, other than satisfying the Section 3.1 UACR approval

requirements.  This suggests that those drafting the SIP knew how to indicate that EPA approval

was required when that was what the parties intended.  As Kennecott argues, "[w]here EPA

approval is required for adjustments made by the state under express authority in the SIP, the SIP

says so," and it does not do so here.[56]  Overall, the material moved provision means what it

says—Kennecott may exceed the 150.5 million ton per year limit if it obtains prior approval

from the State in accordance with Section 3.1 of the UACR, which it has indisputably done.

### B. The Material Moved Provision is Unambiguous

Having concluded that the plain meaning of the material moved provision permits

unilateral State approval, the court now considers whether the regulation is ambiguous as

written.  This determination is significant because if the court concludes that the regulation is

ambiguous, the court may look to additional sources, outside of the regulation itself, to discern

---

[55] UTAH ADMIN. CODE R307-203-1(f) (concerning sulfur content in fuels); UTAH ADMIN. CODE R307-325-1(3) (concerning ozone); *see* Dkt. 45 at 26 n.12.

[56] Dkt. 45 at 26 n.12.

meaning.  But resorting to external sources, such as the Preamble to the SIP and EPA's interpretation of the regulation, is inappropriate if the statute is unambiguous.[57]

A statute is ambiguous if the language of the statute "can be reasonably understood in two or more different senses."[58]  "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which the language is used, and the broader context of the statute as a whole."[59]  The court does not look beyond the statute when determining whether the language is ambiguous.[60]

Here, the language of the material moved provision is not ambiguous.  This language cannot "reasonably be understood in two or more different senses."  It states simply "[t]otal material moved (ore and waste) shall not exceed 150,500,000 tons per 12-month period without prior approval in accordance with Section 3.1, UACR."

Citizen Groups argue that "[a]s evidenced by competing interpretations of production limit [sic] and by EPA's careful consideration of the otherwise indefinite language that appears to conflict with federal and state law, the Utah SIP limit provision is ambiguous."[61]  This argument is not convincing.  Nowhere do the Citizen Groups explain why the material moved provision is "indefinite" by referencing the language of the SIP itself.  For example, they do not direct the court to other specific provisions of the SIP that create ambiguity, nor do they explain how the provision itself is open to more than one reasonable interpretation.  The court cannot

---

[57] *See, e.g., Christensen v. Harris County*, 529 U.S. 576, 588 (2000) ("*Auer* deference is warranted only when the language of the regulation is ambiguous."); *El Comite Para El Bienestar de Earlimart v. Warmerdam*, 539 F.3d 1062, 1072 (9th Cir. 2008) ("[T]he [EPA SIP] preamble language should not be considered unless the regulation itself is ambiguous.").

[58] *Sierra Club v. El Paso Gold Mines, Inc*., 421 F.3d 1133, 1143 (10th Cir. 2005).

[59] *Id.* (citation omitted).

[60] *See Pennsylvania Dept. of Corrections v. Yeskey*, 524 U.S. 206, 212 (1998) (refusing to look to the title of the statute before the court had determined whether the statutory language itself was ambiguous).

[61] Dkt. 47 at 19.

consider the extrinsic sources that the Citizen Groups point to, such as the Preamble to the SIP or EPA's interpretations, in order to find ambiguity in an otherwise unambiguous provision.

### C.  Plaintiffs Have Failed to Show Contrary Administrative Intent or Absurd Results

Citizen Groups argue that the court should not give the unambiguous material moved provision its plain meaning, but should instead read it to require Kennecott to obtain EPA approval in addition to State approval before exceeding the 150.5 million ton per year limit. While there are certain specified narrow circumstances where a court will not give effect to the plain language of a regulation, Citizen Groups have failed to show that any of these circumstances are present in this case.  "[T]he plain language of a regulation . . . will not control if 'clearly expressed [administrative] intent is to the contrary or [if] such plain meaning would lead to absurd results.'"[62]  Citizen Groups argue that the court is required to read the material moved provision to necessitate EPA approval, because to interpret the provision to require only unilateral State approval would be contrary to EPA's clearly expressed administrative intent and would create an absurd result.

### 1.      Administrative Intent

While the Ninth Circuit has stated that the plain language of a regulation "will not control if 'clearly expressed [administrative] intent is to the contrary,'"[63] the Tenth Circuit has not expressly adopted such a rule.  And even when applying this rule, the Ninth Circuit has limited the material a court can look to when determining clearly expressed administrative intent. Recognizing that the rule could allow the clearly expressed intent of regulators to overcome the plain meaning of a regulation, the Ninth Circuit has concluded that "the notice requirements of

---

[62] *Safe Air For Everyone v. EPA*, 488 F.3d 1088, 1097 (9th Cir. 2007) (quoting *Dyer v. United States*, 832 F.2d 1062, 1066 (9th Cir.1987)).

[63] *Id.* at 1097.

the APA . . . require[] that some indication of the regulatory intent that overcomes plain language must be referenced in the published notices that accompanied the rulemaking process."[64]  The court explained that to consider other expressions of administrative intent would not allow interested parties a "meaningful opportunity to comment on the proposed regulation that the APA contemplates, because they would have had no way of knowing what was actually proposed."[65]

Citizen Groups argue that "[i]n both published notice that accompanied the 1994 [$PM_{10}$] SIP and in notices accompanying Utah's subsequent proposed SIP revisions, EPA has expressed 'regulatory intent.'"[66]  They argue that the court would "revise" the SIP by reading the plain language without reference to the meaning EPA has purportedly assigned to its terms.  But the materials the Citizen Groups cite to, including the Preamble to the SIP and EPA's subsequent interpretation of the regulation, are not contemporaneous with the 1994 rulemaking process.  Even if the Tenth Circuit adopted the "clearly expressed administrative intent" exception developed in the Ninth Circuit, this court could not consider the materials submitted by the Citizen Groups.  The statements in these materials failed to provide interested parties the type of notice that the Ninth Circuit requires under the APA.

While the Preamble may technically have "accompanied" the 1994 rulemaking process, it was published at the time EPA approved the SIP.  The Preamble therefore could not have provide interested parties an understanding of the language contained in the SIP in time to allow them to participate fully in the prior notice and comment rulemaking.  To now consider these expressions of regulatory intent to overcome the plain language of the regulation would

---

[64] *Id.* at 1097–98.

[65] *Id.* at 1098.

[66] Dkt. 47 at 13.

undermine the APA rulemaking process.  It would also be unfair to interested parties, like

Kennecott, who must have a fair chance to comment on proposed regulations with an

understanding of what those regulations propose.  The court concludes that Citizen Groups have

not shown that the clearly expressed regulatory intent is contrary to the plain meaning of the

material moved provision.[67]

---

[67] The court notes that even if the Preamble of the SIP and EPA's statements are considered, these materials fail to show clearly expressed administrative intent.  Citizen Groups read the Preamble to impose additional conditions on changes to emissions limitations.  Citizen Groups cite to the following language:

> The approval of this $PM_{10}$ plan for Salt Lake and Utah Counties establishes emission limitations and implementation milestones. The State must update its SIP for changes to these emission limitations, especially for stationary sources. EPA and the State agree that such updates (which are SIP Revisions) will occur each September, as appropriate. Should differences exist between emission limitations, EPA will enforce, as necessary, the most stringent limitation.  59 Fed. Reg. 35,036, 35,044 (July 8, 1994).

Citizen Groups argue that mining in excess of the default limit, even with State approval, is a "change" to the emission limitations of the SIP.  For this reason, EPA involvement is required.  The Preamble, however, speaks only broadly to "emission limitations" and is not clearly applicable to the material moved provision.  There is nothing in the above language that clearly modifies the unambiguous plain meaning of the material moved provision.  The court finds no reason to allow this broader language, which is not part of the regulation, to control the specific regulatory provision dealing with material  moved.  *See Elwell v. Oklahoma ex re. Bd. Of Regents of Univ. of Okla.*, 693 F.3d 1303, 1310 (10th Cir. 2012) ("However inclusive may be the general language of a statute . . . it will not be held to apply to a matter specifically dealt with in another part of the same enactment." (citation omitted)).

Citizen Groups next argue that EPA's own statements make clear that the material moved provision requires Kennecott to receive approval from EPA, in addition to the State.  But Citizen Groups have not demonstrated that EPA reads the SIP provision to contain any additional condition.  Instead, while EPA's public statements suggest some version of buyer's remorse on the terms negotiated for the 1994 $PM_{10}$ SIP, in these statements EPA itself appears to interpret the provision to delegate discretionary authority to the State.

Notably, in 2001, EPA granted extensions to the attainment dates for the Salt Lake County and Utah County $PM_{10}$ nonattainment areas.   While taking that action, EPA appeared to comment directly on the meaning of the SIP provision in this case.  EPA stated:

> We note that in some cases, the State adopted and implemented changes to the emissions limitations contained in the SIP. Although we don't agree with them, we don't believe it is appropriate to penalize the State for making such changes because the language of the currently-applicable SIP appears to allow the State such latitude (see UACR 307-1-3.2.4; Appendix A to $PM_{10}$ SIP.) We have had ongoing discussions with the State regarding these "director's discretion" provisions in the context of the State's future development of redesignation requests and maintenance plans for the two counties, and have informed the State that we believe this apparent discretion to unilaterally change SIP terms is inconsistent with the SIP oversight role provided EPA under the Act, and would need to be removed if maintenance plan submissions for these areas are to be found approvable. 66 Fed. Reg. 32,752 (June 18, 2001).

## 2.     Absurd Results

In a second attempt to avoid the unambiguous plain meaning of the material moved provision, Citizen Groups argue that it would be absurd to allow Utah to authorize the movement of material over the default limit via an Approval Order.[68]   Absurdity is a valid reason to avoid giving effect to the plain meaning of a statutory provision.[69]   But "[o]ne claiming that the plain, unequivocal language of a statute produces an absurd result must surmount a formidable hurdle."[70]   To demonstrate absurdity, Citizen Groups must show that the plain language interpretation would "lead[] to results so gross as to shock the general moral or common sense."[71]   In other words, they must show that "it would have been unthinkable for [the drafters of the regulation] to have intended the result commanded by the words of that statute—that . . . the result would be 'so bizarre that [the drafters] could not have intended it.'"[72]

Citizen Groups fail to make this showing.  In advancing their absurdity argument, Citizen Groups walk a fine line.  While they are not foreclosed from arguing that the result of the plain-language interpretation is absurd, they cannot argue that the SIP itself is illegal—lest they risk

In this statement, while the EPA voices its concern that the SIP provision was "inconsistent with the SIP oversight role provided EPA under the [CAA]," it also recognizes that the plain language of the SIP "appears to allow the State . . . latitude" to "adopt and implement changes to the emission levels contained in the SIP."  *Id.*   While EPA says only that the language "appeared" to provide this authority, it nevertheless declines to approve any maintenance plans that include the language and declines to take action against the State for exercising this authority.   In sum, these sources, even if the court were to look to them, fail to show clearly expressed administrative intent supporting Citizen Groups' argument.

[68] Dkt. 47 at 12, 12 n.9; Dkt. 51 at 5.

[69] *Robbins v. Chronister*, 435 F.3d 1238, 1241 (10th Cir. 2006) (en banc).

[70] *Id.*

[71] *Id.* (citation omitted).  The Tenth Circuit also notes, "[t]he absurdity doctrine should not be confused with a useful technique for resolving ambiguities in statutory language. When statutory language reasonably admits of alternative constructions, there is nothing remarkable about resolving the textual ambiguity against the alternative meaning that produces a result the framers are highly unlikely to have intended. We choose the reasonable result over the 'absurd' one."  *Id.*  Because the court here concludes that the statute is not ambiguous, Citizen Groups cannot rely on the less exacting rule for resolving ambiguities to avoid absurd results.

[72] *Id.* (citation omitted).

depriving the court of jurisdiction to consider their claim.[73]  Therefore, the court will not entertain any argument that the result of the application of the 1994 $PM_{10}$ SIP's material moved provision is absurd because its application is illegal.  This logic would allow a collateral attack on a SIP and render meaningless the jurisdictional provisions of the CAA, which provide that a challenge to the legality of the SIP must be brought in a circuit court under Section 307, while challenges that allege violations of the SIP as written are brought in the district court under Section 304(a).

        With this limitation in mind, the court understands the Citizen Groups to argue that the result of the application of the plain language of the material moved provision is absurd because it would have been unthinkable for EPA to approve a provision that grants the State such broad discretion to alter the amount of mining material Kennecott may move annually.  The court concludes that granting the State discretion to modify the amount of material moved by Kennecott through an Approval Order issued in accordance with Section 3.1 of the UACR is neither unthinkable nor a shock to the general moral or common sense.

        First, it is not unthinkable that EPA approved this provision when the CAA creates a federal-state partnership where states play a vital role in attaining the NAAQS and are provided considerable discretion in the methods they use to attain healthy air.[74] Given that the CAA depends for its effective operation on states acting as regulatory partners rather than regulatory antagonists, it is not unthinkable that EPA would respect the approval process Utah had in place for issuing these orders, which was integrated into the SIP.

        Second, it is not unthinkable that EPA would approve this provision when Section 3.1 of the UACR, which was also part of the EPA approved SIP, limits the State's discretion in

---

[73] *See supra* § I.

[74] *US Magnesium, LLC v. EPA*, 690 F.3d 1157, 1159–60 (10th Cir. 2012).

important ways.  The Executive Secretary of the Utah Quality Board issued the Approval Orders in compliance with the detailed requirements in this Section.[75]  The 1999 Approval Order explicitly notes that granting Kennecott's request will mean more mining and may increase hauling distance, "two factors [that] will tend to increase the emissions of fugitive dust at the mine."[76]  The Approval Order notes, however, that the increase in fugitive dust will be offset by emission reduction credits for other modernization efforts, at a ratio of 1.2 tons per year in reductions to 1 ton per year in increases.[77]  On this basis, the Approval Order states that the project meets the requirements of both Utah's air quality regulations and the goals of the Utah Air Conservation Act.[78]  Likewise, the 2011 Approval Order pairs Kennecott's higher material moved limit with measures to reduce net particulate matter emissions.[79]

        Finally, EPA's approval of the SIP containing the material moved provision is not unthinkable when means exist to challenge or change the content of Approval Orders at the time they are issued.  The Executive Secretary proposing an Approval Order must publish it in the affected local area and notify officials, regulators, and agencies with a stake in the decision, most prominently EPA itself.[80]  Approval Orders can be challenged in an administrative hearing, and, in the event of an adverse decision, appealed to the Utah state courts.[81]  Given the federal-state partnership espoused in the CAA, the protections found in Section 3.1, and the ability of EPA and others to challenge the State Approval Orders, it is not unthinkable that EPA would approve

---

[75] *See* UTAH ADMIN. CODE R307-1-3.1; Dkt. 38-2.

[76] Dkt. 39-6 at 4.

[77] *Id.*

[78] *Id.*

[79]  Dkt. 39-11 at 4.

[80] Dkt. 38 at 8; Dkt. 39-6 at 3–4.

[81] Dkt. 38 at 8–9; *see, e.g.*, *Utah Chapter of the Sierra Club v. Air Quality Bd.*, 226 P.3d 719, 722–25 (Utah 2009).

the SIP with the material moved provision granting the State discretion to alter the material moved limit.  It is also not a shock to the general morals or common sense that the State could unilaterally change the amount of material Kennecott can move given these protections are in place.

## III.    Illegal Modification of the SIP

Having concluded that the unambiguous plain meaning of the regulation allows Kennecott to increase the amount of material moved through unilateral State approval—and having found that the Plaintiffs failed to show that this plain-language interpretation is contrary to any clearly expressed regulatory intent or leads to absurd results—the court now considers the Citizen Groups' final argument.  Citizen Groups argue that reading the material moved provision to allow an Approval Order to authorize the movement of material over the 150.5 million ton per year limit would illegally modify or revise the SIP.  In support of this point, Citizen Groups devote an extensive amount of its briefing to establishing the uncontroversial point that Utah may not "unilaterally" revise the SIP.[82]  This point is not in dispute, however, and lacks relevance, because in following the plain meaning of the provision Kennecott does not revise the SIP.  Because neither Kennecott, nor Utah, nor this court are revising the SIP, no illegal modification is being undertaken, and no formal revision through approved processes is necessary.  The SIP is simply being implemented as it was written and approved in the first instance.[83]

To the contrary, if the court now read an EPA approval requirement into the SIP contrary to the unambiguous plain meaning of the regulation, it would be revising the SIP and undermining the revision process set out in the CAA.  This revision process, which includes

---

[82] *See, e.g.*, Dkt. 40 at 4, 14-21; Dkt. 47 at 11–13, 21–22; Dkt. 51 at 5–6, 10.

[83] *See United States v. General Motors Corp.*, 702 F. Supp. 133, 137–38 (N.D. Tex. 1988).

notice and comment rulemaking, provides an opportunity for those parties affected by the rules to comment on any proposed changes.  "This [process] assures fairness and mature consideration of rules having a substantial impact on those regulated."[84]

## CONCLUSION

Citizen Groups manifestly believe that the Utah SIP does not fulfill the goals of the CAA. Achieving their desired changes, however, is not an end they can achieve through a citizen suit. EPA can continue to seek revisions to the SIP and can issue a SIP call if it determines that the SIP is substantially inadequate to attain compliance with the $PM_{10}$ NAAQS.  Also, Utah itself may continue to regulate emitters of harmful pollutants to promote the health and safety of its citizens.  If Citizen Groups believe either federal or state actors should do more, or are failing to honor their responsibilities, then they may direct their arguments to those actors through the appropriate avenues.  "The Clean Air Act does not authorize the imposition of sanctions for conduct that complies with a State Implementation Plan that EPA has approved;"[85] nor does it allow for liability on this basis in the context of a citizen suit.

---

[84] *Pennzoil Co. v. FERC*, 645 F.2d 360, 371 (5th Cir. 1981).

[85] *United States v. Cinergy Corp.*, 623 F.3d 455, 458 (7th Cir. 2010). Further, "[i]nformed by basic principles of due process, it is 'a cardinal rule of administrative law' that a regulated party must be given 'fair warning' of what conduct is prohibited or required of it."  *Wis. Res. Prot. Council v. Flambeau Mining Co.*, 727 F.3d 700, 707–08 (7th Cir. 2013); *see Cinergy Corp.*, 623 F.3d at 458–59 (holding similarly in the context of the CAA).  Kennecott is not responsible for looking beyond the language of the provision at issue and the representations of the administrative agency tasked with responsibility for issuing an Approval Order.  Requiring regulated entities to do more would undermine their ability to comply, even in good-faith, with the applicable regulatory scheme.  Honoring principles of fair warning does more than provide notice to litigants: it is integral to preserving legitimate and effective regulation.

The plain language of the 1994 $PM_{10}$ SIP allows a valid Approval Order to authorize Kennecott to lawfully exceed the 150.5 million ton per year material moved limit.  Having relied on valid Approval Orders, Kennecott is not in violation of the SIP or the CAA.  The court **GRANTS** Defendant's Motion for Summary Judgment (Dkt. 38), and **DENIES** Plaintiffs' Motion for Summary Judgment.  (Dkt. 40.)  The Clerk of Court is directed to close the case.

SO ORDERED this 8th day of June, 2016.

BY THE COURT:

_____
ROBERT J. SHELBY
United States District Judge